# IN THE SUPREME COURT OF THE STATE OF IDAHO

| | |
|---|---|
| STATE OF IDAHO,<br><br>    Plaintiff-Respondent,<br><br>v.<br><br>DARRELL EDWARD PAYNE,<br><br>    Defendant-Appellant.<br>———————————————————<br>DARRELL EDWARD PAYNE,<br><br>    Petitioner-Appellant-Cross Respondent,<br><br>v.<br><br>STATE OF IDAHO,<br><br>    Respondent-Cross Appellant. | Docket No. 28589<br><br>Boise, February 2008<br><br>2008 Opinion No. 86<br><br>Filed:  June 18, 2008<br><br>Stephen W. Kenyon, Clerk<br><br>Docket No. 32389 |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County.  Hon. Thomas Neville, District Judge.

Conviction for first-degree murder, kidnapping, robbery and rape <u>affirmed.</u> Sentence of death on post-conviction <u>vacated</u> and <u>remanded.</u>

Molly J. Huskey, State Appellate Public Defender, Boise, for appellant.  Paula May Swensen, Deputy State Appellate Public Defender argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent.   Lanny Lamont Anderson, Deputy Attorney General argued.

———————————————————

BURDICK, Justice

Darrell Payne appeals his conviction of first-degree murder, first-degree kidnapping, robbery and rape, and his sentence of death for first-degree murder.  He also appeals the summary dismissal of all but one of his claims for post-conviction relief.  The State cross-

1

appeals the district court's order setting aside Payne's death sentence on post-conviction relief. We affirm Payne's conviction, but vacate his sentence on post-conviction and remand to the district court for resentencing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The district court sentenced Payne to death for the murder of Samantha Maher after a jury found him guilty of kidnapping, raping, robbing and murdering Maher.

On July 6, 2000, Payne abducted Maher from Julia Davis Park in Boise. That morning, he left his home as if to go to work, even kissing his wife goodbye, but instead drove to the park. Payne had with him a loaded .22 Ruger and several recent purchases: handcuffs, latex gloves, detailed maps and atlases of Oregon, and camping gear. Payne approached Maher around 10:15 that morning as she was arriving for her class at Boise State University. Carrying the handgun, Payne forced Maher into the front seat of her car. He then handcuffed her wrists and drove her car to an unknown location. After sexually assaulting her, Payne raped Maher, leaving bruises, cuts and scrapes on her face, back and buttocks. After the rape, Payne placed the handgun at the back of Maher's head and shot her. Payne then placed Maher's body in the back seat of her car and drove to his rented home, a former dairy farm, near Nampa. He disposed of her body by dumping it in a concrete drainage tank containing water and debris near one of the barns on the property. He went into his home, ate some left-over pizza and left a note under a bed pillow for his wife. He took Maher's keys and purse containing her credit cards and drove to the Oregon coast and then on to Eugene, Oregon the next day.

When Maher did not return to work after her class, her father began searching for her. When the search for her or her car was unsuccessful, he reported her missing to the Ada County Sheriff's Office. Also on July 6, Payne's boss called Payne's wife, Teresa, to report that Payne was not at work. Teresa's mother then began searching for Payne. When Teresa returned home that evening, she noticed things were out of order and called the Canyon County Sheriff's Office; she was advised that she would have to wait to make the missing person's report.

The search for Maher continued until July 8, 2000. That morning, a Canyon County Sheriff's Deputy arrived at the Payne home to take a missing person's report from Teresa. While the deputy was taking the report, Payne called Teresa. Without Payne's knowledge, Teresa reported parts of their conversation to the deputy. Payne told his wife that he was at a Motel 6 in Eugene, Oregon and that he had overdosed on aspirin in order to kill himself. The deputy then

2

contacted the Eugene police department and asked them to look for Maher and her car and to complete a welfare check on Payne at the motel.

Payne surrendered to the Eugene police after they made telephone contact with him; he crawled out of his room and an officer handcuffed him outside of his second-story motel room. Because the officers had knowledge that Payne had overdosed on aspirin, paramedics responded. After their initial assessment, Payne walked downstairs to the ambulance and was transported to Sacred Heart Hospital. While en route, Payne was advised of and acknowledged his *Miranda* rights.[1] At Sacred Heart, Detective Matthew Herbert advised Payne of his *Miranda* rights again, and after Payne stated that he understood his rights, Herbert began questioning Payne. Payne told Herbert that Maher was no longer alive and that her body was in an open concrete tank behind the barn at his home. When questioned about the blood in the back of Maher's car, Payne told the officer that he must have hurt her; he had a gun and must have shot her. He also explained that he took an overdose of aspirin because he felt badly about what happened to Maher and wanted to "save everybody the hassle." After being released from the hospital, Payne was taken to a holding cell.

Initially, an officer visually searched the motel room, looking for Maher, and saw the handgun and several sheets of paper on the bed; he also found a set of keys. Later, after obtaining a search warrant, the Eugene police searched the room again. They found two letters written by Payne: a "black letter" addressed to Teresa and a "red letter." In both letters, Payne referenced killing Maher; in the "red letter" he referred to committing three other rapes. The search of the motel also turned up the keys to Maher's car; a subsequent search of the vehicle revealed a large amount of blood in the back seat, Maher's credit cards and notebook, .22 caliber bullets, handcuffs, hair dye, latex gloves, men's underwear, men's pants in Payne's size, an atlas, hydrogen peroxide and a sponge, and numerous other items.

Back in Idaho, police officers located Payne's car in Julia Davis Park. They obtained a search warrant and found a leather holster, a box for a set of handcuffs and other items during the search of the car. Officers also visited the Payne residence. Teresa showed them the location of the tank. Inside, Maher was floating face down with a plastic bag over her head. Her pants and underwear were on in an appropriate fashion, but her shirt and bra were pulled above her breasts.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

3

Payne was charged with premeditated first-degree murder, or alternatively felony-murder, first-degree kidnapping, robbery and rape. Payne filed numerous pre-trial motions, including a motion to suppress, which was denied. Payne also filed a notice to rely on mental health evidence. Two expert witnesses for the State then examined Payne. His trial commenced on September 17, 2001; Payne did not present any witnesses, instead arguing that the State had failed to meet its burden. A jury found Payne guilty of first-degree murder, first-degree kidnapping, rape and robbery; the jury returned a special verdict form.

The district court proceeded to sentence Payne pursuant to Idaho's former death penalty statute, I.C. § 19-2515 (2001). The court held a three-day sentencing hearing, consisting of a full day of victim impact statements and two days of testimony. The district court issued its findings as to mitigating and aggravating factors and sentenced Payne to death for the murder of Maher.

Payne then filed for post-conviction relief and amended his petition twice. Payne filed his initial petition for post-conviction relief on July 10, 2002, filed an amended petition on January 13, 2004, and filed his second amended petition on March 26, 2004. After oral argument on this petition, the district court granted the State's motion for summary dismissal of Payne's claims as to all issues except his sentence. The district court granted Payne's petition as to his sentence, concluding that Payne's death sentence violated *Ring v. Arizona*, 536 U.S. 584 (2002). Payne filed a timely notice of appeal, and the State cross-appealed. Payne's direct appeal and his appeal of the dismissal of his post-conviction petition were consolidated.

## II. STANDARD OF REVIEW

This Court's standard of review in death penalty cases is dictated by I.C. § 19-2827. *State v. Fain*, 119 Idaho 670, 671, 809 P.2d 1149, 1150 (1991). Idaho Code § 19-2827 provides, in part:

> (b) The Supreme Court of Idaho shall consider the punishment as well as any errors enumerated by way of appeal.
>
> (c) With regard to the sentence the court shall determine:
>> (1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and
>> (2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance from among those enumerated in section 19-2515, Idaho Code.
>
> (d) Both the defendant and the state shall have the right to submit briefs within the time provided by the court, and to present oral argument to the court.

4

(e) In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, shall be authorized to:

(1) Affirm the sentence of death; or

(2) Set the sentence aside and remand the case for resentencing by a jury or, if waived, the trial judge.

(f) The sentence review shall be in addition to direct appeal, if taken, and the review and appeal shall be consolidated for consideration.

I.C. § 19-2827(b)-(f).

### III. ANALYSIS

Payne raises numerous issues in his brief, asserting errors during both the guilt and sentencing phases of his trial and asserting claims for post-conviction relief. Additionally, the State cross-appeals the district court's order setting aside Payne's death sentence. We will first address Payne's claims as to the guilt phase of his trial. We will then turn to the arguments presented regarding the sentencing phase and the State's cross-appeal.

### A. Guilt phase

We begin by addressing error at the trial level. Payne first asserts that the district court erred in denying his motion to suppress. Additionally, he asserts that the district court erred in summarily dismissing his petition for post-conviction relief based on errors his trial counsel committed during the guilt phase of his trial. Finally, Payne argues that the district court erred in summarily denying his petition for post-conviction relief as to his claims for prosecutorial misconduct, lack of a meaningful opportunity to develop his post-conviction arguments and the unconstitutionality of I.C. § 19-2719. We will turn first to Payne's only direct appeal argument—the motion to suppress—before turning to his post-conviction claims.

1. Motion to suppress

On appeal, Payne argues that the district court erred in denying his motion to suppress the statements he made to Officer Herbert at the hospital in Eugene because Payne invoked his right to remain silent, and in the alternative, any waiver of his right to remain silent was not made voluntarily, knowingly and intelligently. Finally, Payne argues that the district court's reliance on the public safety exception as an alternate ground to deny his motion was misplaced.

In reviewing an order granting or denying a motion to suppress evidence, this Court reviews the trial court's findings of fact for clear error; however, the Court freely reviews the application of constitutional requirements in light of the facts found. *State v. Smith*, 144 Idaho 482, __, 163 P.3d 1194, 1197 (2007). A district court's conclusion that a defendant made a

knowing and voluntary waiver of his *Miranda* rights will only be disturbed on appeal if the conclusion is not supported by substantial and competent evidence. *State v. Varie*, 135 Idaho 848, 851, 26 P.3d 31, 34 (2001).

### a. Invocation

Prior to trial, Payne moved to suppress statements he made to Officer Herbert during his interrogation at the hospital in Eugene. The district court denied Payne's motion to suppress as to the statements he made to Herbert.

At the suppression hearing, Herbert testified that he initially met Payne at the Sacred Heart Hospital Emergency Room in Eugene, Oregon. Herbert began by introducing himself and identifying himself as a police officer. His first question to Payne was: "Is she still alive?" Payne answered, "I don't think I should answer that." Herbert also testified that after making this statement, Payne never expressed an unwillingness to answer questions and never asked for counsel.

After a suspect has been advised of the right to remain silent and of the right to counsel pursuant to *Miranda*, police may not proceed with questioning if the suspect indicates a desire to remain silent. *Miranda*, 384 U.S. at 473-74; *State v. Rhoades*, 119 Idaho 594, 602, 809 P.2d 455, 463 (1991). An individual's right to cut off questioning is grounded in the Fifth Amendment and must be "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 103 (1975). However, police officers are only required to cease questioning if the invocation of *Miranda* rights is clear and unequivocal. *See Davis v. United States*, 512 U.S. 452, 459-60 (1994); *Varie*, 135 Idaho at 853, 26 P.3d at 36. The United States Supreme Court held that in order to effectively invoke the right to counsel, a suspect must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney . . . . If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Davis,* 512 U.S. at 459-62. This "clear articulation" rule is also applicable to a defendant's assertion of his right to remain silent. *State v. Law*, 136 Idaho 721, 724-25, 39 P.3d 661, 664-65 (Ct. App. 2002) (citing *United States v. Banks*, 78 F.3d 1190, 1197 (7th Cir. 1996); *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir. 1995); *Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir. 1994)); *see also Arnold v. Runnels*, 421 F.3d 859, 865 (9th Cir. 2005); *State v. Whipple*, 134 Idaho 498, 502-04, 5 P.3d 478, 482-484 (Ct. App. 2000). "Thus, a

suspect's ambiguous or equivocal comment that does not plainly express a desire to remain silent or to terminate the interview will not obligate police to cease questioning." *Law*, 136 Idaho at 725, 39 P.3d at 665.

Here, Payne's statement, "I don't think I should answer that," is not sufficiently clear such that a reasonable officer in the circumstances would understand it as an invocation of the right to remain silent. The phrase, "I think," like the phrase "maybe I should" is equivocal. *Clark v. Murphy*, 331 F.3d 1062, 1070 (9th Cir. 2003). As Payne did not clearly invoke his right to remain silent, Herbert had no duty to discontinue his questioning of Payne. *See Davis*, 512 U.S. at 460-62.

### b. Waiver

However, that Payne did not unequivocally invoke his right to silence does not end our analysis. Payne's statements are only admissible if the waiver of his right to remain silent was made voluntarily, knowingly and intelligently. *See, e.g., State v. Luke*, 134 Idaho 294, 297, 1 P.3d 795, 798 (2000). "The trial court's conclusion that a defendant made a knowing and voluntary waiver of his *Miranda* rights will not be disturbed on appeal where it is supported by substantial and competent evidence." *Id*.

The district court found:

1. The defendant had been properly advised of his Miranda Rights twice before his interview by Detective Herbert (Once by Officer Vaira and once by Detective Herbert);

2. The defendant was mentally and emotionally capable of understanding and waiving his Miranda Rights;

3. The defendant understood his Miranda Rights and knowingly, voluntarily and intelligently waived them;

4. The defendant voluntarily responded to the questions asked and gave no involuntary responses or statements;

5. The defendant was not under the influence of alcohol at the time of his interview by Detective Herbert.

6. That while the defendant had ingested an undetermined amount of aspirin, it was not enough to require hospitalization and it did not result in anaphylactic shock. That while the defendant had an upset stomach and ringing in his ears, he was not incapacitated and his condition did not interfere with his ability to understand and waive his Miranda Rights. The defendant voluntarily chose to speak to Detective Herbert.

7

7. The defendant responded to all but approximately two or three questions asked [including Herbert's first question, "Is she still alive?"]

It then concluded, "[a]fter seeing the witnesses, hearing them testify and reviewing the exhibits, the [c]ourt finds by a preponderance of the evidence that under the totality of the circumstances test, the defendant had the capacity to understand, did understand, and properly waived his Miranda Rights."

These findings and the district court's conclusion are supported by substantial and competent evidence. First, Christian R. Brackett, a paramedic in Eugene who responded to the hotel, testified that Payne was oriented to person, place, time and situation. Brackett found Payne "to be aware of who he was. He told [Brackett] that he knew where he was, he knew what day it was and he understood—he seemed to understand the situation based on answering those questions accurately." Brackett also testified that Payne's speech was clear and accurate and that Payne was lucid and not confused, but that Payne appeared a little depressed. Additionally, Brackett testified that Payne was able to walk without assistance from the second floor of the motel and was able to support his own weight.

Next, Officer Arlin Vaira, the Eugene police officer who accompanied Payne in the ambulance, testified that he read Payne his *Miranda* rights en route to the hospital. He also noted that after each right, Payne responded that he understood that right. Vaira also testified that Payne gave Vaira, in response to a question, his name and birth date and spelled his name.

After Payne arrived at the hospital, Detective Herbert also read Payne his *Miranda* rights, and asked if he understood those rights. Herbert testified that Payne did not have any difficulty understanding Herbert's questions, and although he responded to them in a low speech volume, Payne's answers were logically responsive to the questions asked. Herbert also testified that Payne seemed oriented to the events around him and did not appear intoxicated.

Finally, Dr. Charles Steuart, a medical doctor, reviewed Payne's medical records from Sacred Heart Hospital and testified that Payne's aspirin level did not require hospitalization. He also testified that Payne had not been given any medications which would interfere with his mental processes.

Although the State elicited additional testimony at the hearing supporting the district court's decision, the testimony discussed *supra* supports the district court's findings and conclusions. Therefore, since Payne did not invoke his right to remain silent and because the district court's decision that he knowingly, voluntarily and intelligently waived his *Miranda*

8

rights is supported by substantial and competent evidence, we affirm the district court's order denying Payne's motion to suppress the statements to Herbert. Accordingly, we need not determine whether the public safety exception is an alternative ground supporting the district court's denial of Payne's motion to suppress.

2. Post-conviction issues

Payne raises a number of post-conviction issues dealing with his trial counsel's conduct during the guilt phase of his trial. He maintains that the district court erred in summarily dismissing his claims that his counsel was ineffective in failing to suppress an eyewitness identification, failing to suppress the admission of the letters found in the motel room and failing to object to the prosecution's closing arguments. He also maintains that the district court erred in dismissing his post-conviction claims based on prosecutorial misconduct, the lack of a meaningful opportunity to develop his post-conviction claims, and the constitutionality of I.C. § 19-2719. We will address each issue in turn, after setting out the standard of review.

*a. Applicable legal standard*

A post-conviction relief petition initiates a civil, rather than criminal, proceeding. *Clark v. State*, 92 Idaho 827, 830, 452 P.2d 54, 57 (1969). Like the plaintiff in a civil action, the applicant must prove by a preponderance of evidence the allegations upon which the request for post-conviction relief is based. I.C. § 19-4907; *Stuart v. State*, 118 Idaho 865, 869, 801 P.2d 1216, 1220 (1990). "An application for post-conviction relief differs from a complaint in an ordinary civil action[.]" *Dunlap v. State*, 141 Idaho 50, 56, 106 P.3d 376, 382 (2004) (alteration in original). The "application must contain much more than 'a short and plain statement of the claim' that would suffice for a complaint under I.R.C.P. 8(a)(1)." *Goodwin v. State*, 138 Idaho 269, 271, 61 P.3d 626, 628 (Ct. App. 2002). The application must present or be accompanied by admissible evidence supporting its allegations, or the application will be subject to dismissal. I.C. § 19-4903.

Idaho Code § 19-4906 authorizes summary dismissal of an application for post-conviction relief, either pursuant to motion of a party or upon the trial court's own initiative. Summary dismissal of an application is the procedural equivalent of summary judgment under I.R.C.P. 56. Summary dismissal is permissible only when the applicant's evidence has raised no genuine issue of material fact that, if resolved in the applicant's favor, would entitle the applicant to the relief requested. If such a factual issue is presented, an evidentiary hearing must be

9

conducted. *Gonzales v. State*, 120 Idaho 759, 763, 819 P.2d 1159, 1163 (Ct. App. 1991). However, summary dismissal may be appropriate even where the State does not controvert the applicant's evidence because the court is not required to accept either the applicant's mere conclusory allegations, unsupported by admissible evidence, or the applicant's conclusions of law. *Roman v. State*, 125 Idaho 644, 647, 873 P.2d 898, 901 (Ct. App. 1994).

On review of a dismissal of a post-conviction relief application without an evidentiary hearing, the Court must determine whether a genuine issue of fact exists based on the pleadings, depositions and admissions together with any affidavits on file. *Ricca v. State*, 124 Idaho 894, 896, 865 P.2d 985, 987 (Ct. App. 1993). "[W]here the evidentiary facts are not disputed and the trial court rather than a jury will be the trier of fact, summary judgment is appropriate, despite the possibility of conflicting inferences because the court alone will be responsible for resolving the conflict between those inferences." *State v. Yakovac*, 145 Idaho 437, ___, 180 P.3d 476, 482 (2008). "When an action is to be tried before the court without a jury, the judge is not constrained to draw inferences in favor of the party opposing a motion for summary judgment but rather the trial judge is free to arrive at the most probable inferences to be drawn from uncontroverted evidentiary facts." *Id.*

### b. Ineffective assistance of counsel

We review claims for ineffective assistance of counsel utilizing the two-prong test set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). *Mitchell v. State*, 132 Idaho 274, 277, 971 P.2d 727, 730 (1998). To prevail on such a claim, the applicant for post-conviction relief must demonstrate (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's errors, the result would have been different. *Strickland*, 466 U.S. at 687-88, 692; *Mitchell*, 132 Idaho at 277, 971 P.2d at 730. When evaluating an ineffective assistance of counsel claim, this Court does not second-guess strategic and tactical decisions, and such decisions cannot serve as a basis for post-conviction relief unless the decision is shown to have resulted from inadequate preparation, ignorance of the relevant law or other shortcomings capable of objective review. *Pratt v. State*, 134 Idaho 581, 584, 6 P.3d 831, 834 (2000). "There is a strong presumption that counsel's performance fell within the wide range of professional assistance." *State v. Hairston*, 133 Idaho 496, 511, 988 P.2d 1170, 1185 (1999) (internal quotations omitted) (quoting *Aragon v. State*, 114 Idaho 758, 760, 760 P.2d 1174, 1176 (1988)).

### i.  Eyewitness identification

At trial, the prosecution mentioned an eyewitness, Megan Toole, during its opening argument, and Payne's counsel moved for a mistrial believing her testimony had been the subject of a pretrial motion. However, they had not made a motion to exclude her testimony and trial continued.  During her testimony, Toole indicated that she observed Payne sitting in his parked car near the Greenbelt in Julia Davis Park the morning of Maher's kidnapping, rape and murder. She remembered him waving to her during her morning jog.  Later, on July 13, 2000, after Payne was in custody and after she saw a picture of Payne on the news, Toole contacted police to let them know she had seen Payne on the morning of July 6.  On July 14, after having her describe the details of the car she had seen, the officer showed her a picture of Payne's car, which she identified as the car she had seen.  Police officers then showed Toole the picture of Payne that had been released to the media and that she had already seen on television.

Payne argues his counsel was ineffective in failing to move to suppress Toole's eyewitness identification, in presenting only "woefully inadequate" cross-examination of Toole and in failing to present the jury with expert witness testimony regarding the fallibility of eyewitness identifications.  The State argues that a motion to suppress would not have been granted, so Payne has failed to establish ineffective assistance of counsel.  It also argues that because the jury was instructed as to facts which bear upon the accuracy of eyewitness testimony, Payne has failed to show that his trial counsel was ineffective for failing to produce expert witness testimony.

First, Payne asserts that showing Toole only a single photograph (the same photograph shown on the news) was impermissibly suggestive, and its admission violated Payne's right to due process.  Therefore, he concludes, trial counsel was ineffective for failing to move for the suppression of Toole's identification.

"Effective legal representation does not require that an attorney object to admissible evidence."  *State v. Aspeytia*, 130 Idaho 12, 15, 936 P.2d 210, 213 (Ct. App. 1997).  "Where the alleged deficiency is counsel's failure to file a motion, a conclusion that the motion, if pursued, would not have been granted by the trial court, is generally determinative of both prongs of the [*Strickland*] test."  *Sanchez v. State*, 127 Idaho 709, 713, 905 P.2d 642, 646 (Ct. App. 1995). Thus, in order to determine if counsel's failure to object fell below a reasonable standard, this Court must first determine whether Toole's identification should have been suppressed.

For an out-of-court identification to taint an in-court identification, the out-of-court identification must have been "so suggestive that there is a very substantial likelihood of misidentification." *State v. Trevino*, 132 Idaho 888, 892, 980 P.2d 552, 556 (1999). "Due process requires the exclusion of identification evidence if *police suggestiveness* created a substantial risk of mistaken identification, except where the reliability of the identification is sufficient to outweigh the corrupting effect of the suggestive identification." *Id*. (citation omitted) (emphasis added). "[S]ingle subject showups are inherently suspect and generally not condoned . . . ." *State v. Hoisington*, 104 Idaho 153, 162, 657 P.2d 17, 26 (1983). However, "reliability is the linchpin in determining the admissibility of identification testimony." *Id.* at 161, 657 P.2d at 25 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)). The question of whether improper suggestiveness exists is determined from a totality of the circumstances. *Neil v. Biggers*, 409 U.S. 188, 196 (1972). Factors to review in determining whether an identification is reliable include: "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated at the identification; and (5) the length of time between the crime and the identification." *Trevino*, 132 Idaho at 893, 980 P.2d at 557.

Here, there is simply no state action and no police suggestiveness creating a risk of misidentification. Toole initiated the contact with the police after seeing a photo of Payne on television. Once she met with them, she was shown only a single photo of Payne, but it was the same photo she had seen on television and the same photo that caused her to contact the police. This sequence of events makes the single photo lineup non-suggestive. In fact, Toole's identification without police involvement from the photograph released to the media insulates her identification from Payne's arguments about the suggestiveness of the single photo lineup.

Additionally, our review leads to the conclusion that each of the five factors weighs in favor of finding Toole's identification was sufficiently reliable so as to be admissible. First, Toole had an opportunity to view Payne on the morning of July 6. She testified that she noticed him as she was jogging; he caught her attention because he was leaning across the passenger compartment of his car and waving to her. She observed him from the distance of about the width of a single lane road. Second, Toole was paying attention to Payne. She testified that his waving attracted her attention, so that even though she does not normally notice people during her jogs, she noticed Payne. She also noticed many details about the scene. She observed the

12

color of his car, that Payne was not wearing a hat or glasses and that he was wearing a light colored shirt, and that he waved with his left hand. She also testified that she kept replaying this scene in her head trying to figure out if she knew Payne or how he might know her. Third, Toole also accurately identified Payne at the police station; her verbal description of him and his car was accurate and led the officer to show Toole the picture. Fourth, Toole was absolutely certain that she had seen Payne. When asked if she was certain of her identification, she stated that she was. Additionally, she testified that Payne's hair was shorter and he was heavier at trial than he had been the day he waved at her during her jog. Finally, only a week had passed between Toole seeing Payne in Julia Davis Park and her identification of him based on the photograph broadcast over the news. Such is a sufficiently short time to conclude that her identification is reliable.

Therefore, we conclude that Toole's identification was admissible, and that Payne's counsel was not ineffective for failing to move for its suppression. We need not determine whether the alleged ineffectiveness was compounded by the "inadequate" cross examination of Toole, as there was no ineffective assistance in failing to suppress her testimony.[2]

Payne also argues that his counsel was ineffective for failing to produce expert witness testimony on the fallibility of eyewitness identifications. He cites this Court to a number of cases standing for the proposition that advising the jury of the reliability of eyewitness identifications can assist the jury. While it is true that such testimony may help a jury, Payne's counsel's decision not to introduce this type of evidence cannot lead to a successful post-conviction claim.

The decision of what witnesses to call "is an area where we will not second guess counsel without evidence of inadequate preparation, ignorance of the relevant law, or other shortcomings capable of objective evaluation." *State v. Larkin*, 102 Idaho 231, 234, 628 P.2d 1065, 1068 (1981); *Bagshaw v. State*, 142 Idaho 34, 38, 121 P.3d 965, 969 (Ct. App. 2005) ("It is generally agreed that the decision of what evidence should be introduced at trial is considered strategic or tactical.") (citing American Bar Association Standards for Criminal Justice 4-5.2). Here, Payne has provided no evidence which suggests that this decision resulted from inadequate preparation,

---

[2] At any rate, cross examination is a tactical decision.

13

ignorance or other shortcomings.[3]    Therefore, the presumption that counsel's performance fell within the acceptable range of professional assistance leads the Court to conclude that failing to introduce expert legal testimony did not fall below an objective standard of reasonableness.[4]

> ii.    Black letter

Payne asserts that his counsel was ineffective for agreeing to redactions of one sentence in the black letter.  He argues counsel should have argued that the sentence in the black letter was inadmissible in its entirety under Idaho Rule of Evidence 404(b) as evidence of prior bad acts.  His argument relies on the contention that reading the black letter and red letter together shows that the rape reference in the black letter was to other rapes occurring at Maple Grove and Barber Park, and not to the rape of Maher.[5]

> The red letter provides:

> Don't show this to Teresa please
> All in Boise
> To set the record straight,
> *raped the woman at the apartment on Maplegrove*
> *raped the girls at barber park*
> kidnapped, killed and stole the mustang
> > body in septic behind barn
> These are things I have partial memorys [sic] of so I'm pretty sure I did them, I don't remember killing the girl whose car I have but theres is memory of dumping the body in the tank and lots of blood in the back seat, so I must of

At trial, this letter was redacted to exclude the references to the two other rapes—the two lines italicized above.

The black letter was found in Payne's motel room, and is addressed to his wife, Teresa.  Unredacted it provides, in pertinent part:

> I can't come back, I'm dead either way.  This way its quite [sic] and over with quickly.  Not drawn out thru [sic] the courts and prison and everything.  And they

---

[3] Moreover, even if this conduct fell below a reasonable standard, Payne has not shown prejudice, because the district court gave the jury instruction number 32 regarding facts which bear upon the accuracy of witnesses' identification.

[4] Additionally, the evidence against Payne is overwhelming.  Even if his counsel had more vigorously cross examined Toole or introduced an expert witness, Payne would still have been convicted.  Thus, there was no prejudice from the allegedly deficient performance.

[5] Even if this were true of the unredacted letters, the jury was presented with only the redacted letters.  It had no knowledge of other rapes from the redacted red letter.  Therefore, even if the misspelling of the word "memorie" in the redacted black letter could lead a juror to speculate that the letter should read memories—which is a doubtful proposition given the grammar and spelling in Payne's letters—it is simply unreasonable to assume that a juror would read the two redacted letters together and assume Payne had committed other rapes.  As such, Payne cannot show prejudice.

14

will kill me. I've done terrible things. I'm sure I killed the girl that I have her car. I don't actually remember it but I do remember getting rid of the body. *I have some memories of rapes.* I don't know why I've lost control. It kills me that I've done this too [sic] you and the boys. I don't deserve to live anymore. And I have no control left. Even feeling this way, on the ride over to the . . . I would see a pretty girl and want to go over [and] either expose myself to her or abduct her. You . . . I have to do this. But as always, I'm taking the easy way out. I'm so sorry.

Prior to trial, Payne moved to suppress the black letter based on marital privilege. This motion was denied.[6] Then during trial Payne's counsel and the prosecution agreed that portions of the black letter needed to be redacted. Payne's counsel wanted the entire sentence, "I have memories of rapes" redacted or changed to "I have memories." The State proposed changing "I have some memories of rapes" to "I have some memories of rape." Payne's counsel was concerned that this changed the meaning of Payne's letter. He argued:

> Judge, what I'm concerned about, so far everything [opposing counsel] said is accurate. That's the point of contention right there. Is that the actual phrase was referring to the other bad acts. And in its redacted form it sounds like [Payne] is referring to this case, and that's where I have the problem.

The district court felt that the "of rapes" should be left in the sentence, as Payne had been charged with rape. It then proposed changing "I have some memories of rapes" to "I have some memorie of rape." While Payne's counsel pointed out that this still left the problem of leading the jury to believe the sentence referred to the Maher rape as opposed to other rapes, the district court pointed out that its redaction "avoid[ed] the other bad acts issue, which I think is even more prejudicial, and perhaps unfairly so, to your client."[7] The black letter was presented to the jury with the redacted sentence reading: "I have some memorie of rape."

Here, Payne's counsel was not ineffective. Payne now argues that his trial counsel "should have cited I.R.E., 404(b) . . . ." However, during trial Payne's counsel pointed out to the judge that the letter referenced "other bad acts." Indeed, the judge proposed the ultimate redactions as a way to avoid presenting the jury with evidence of prior bad acts and determined that the redaction would not unfairly prejudice Payne. Therefore, although Payne now contends

---

[6] Payne did not appeal this decision.

[7] Payne contends the black letter was inadmissible as prior bad acts evidence, and its introduction violated I.R.E. 404(b) and the due process clause of both the federal and Idaho constitutions. While he may be correct, he did not raise this issue on direct appeal. However, this is a death penalty case, so the Court can address the issue. We find the presence of one redacted sentence is harmless error. The evidence against Payne was overwhelming, and there

otherwise, his counsel was not ineffective. His counsel brought the prior bad acts problem to the trial court's attention; that they lost the motion does not make them ineffective. Thus, his counsel's performance did not fall below an objectively reasonable standard.

### iii. Failure to object

Payne argues that his counsel was ineffective for failing to make two objections during the prosecution's closing argument. First, he contends that his counsel should have objected when the prosecution urged the jurors to use their knowledge about weapons during their deliberations. Second, he argues that his counsel should have objected to the prosecution arguing inconsistent theories as to Payne's suicide attempt.

During closing arguments, the prosecutor argued:

> Chet Park [the State's firearms expert] came in here and talked to you and he told you that the characteristics of that weapon are that it had 6 lands and grooves and that it twists to the right. A bullet going through it would twist to the right same as the Ruger. This (indicating) shows you the weapon, and, of course, this is with the slide pulled back. If you remember and I know members of you on this jury who know about weapons, *and I know that you'll help other jurors when it comes time to talk about a semi-automatic weapon.* But to clear that weapon you simply pull that slide back and drop it forward and it picks up the cartridge, just the same way it would in an M-60 machine gun. It picks that cartridge up and slams it into the chamber where the weapon is ready to fire if the safety is off.

Payne argues that the italicized portion of the sentence in the above paragraph called for jurors to "rely upon the extra-record expertise of other jurors regarding the murder weapon."

Park testified as to the characteristics of the murder weapon. Specifically, during cross-examination Park testified as follows:

> Q: Let's say the gun is completely unloaded. How would you make that pistol operable? How could you fire a round through it?
> A: The usual procedure would be to place unfired cartridges into the magazine, place the magazine into the firearm fully and then pull back the slide allowing you to engage one of the unfired cartridges from the magazine that is being pushed up by the magazine spring. And when that slide—well, I can only pull it back a little bit on this one—
> . . . .
> A: When the slide is pulled back sufficiently far to allow an unfired cartridge to be pushed up into the area that it can be caught by the slide, when the slide comes forward, it catches the rear portion of the unfired cartridge pushing it

---

is no reasonable probability that the result would have been different had the entire sentence been redacted from the black letter.

16

forward and the feed ramp of the back part of the barrel allows the bullet to be pushed up into the chamber. And by allowing the slide to go fully forward then it can be placed into a firing position, assuming that the button safety is in a fire position.

Q: Okay. So in other words, if I had a loaded magazine, I would insert it in the handle of that pistol and then pull the slide back, release it and it would load a round into the chamber, correct?

A: Yes, sir.

Q: Okay. Now, if I did that and then took the magazine back out and pulled the trigger, would the slide eject the shell?

A: Yes.

Q: And it would not reload it, correct?

A: There would be nothing available for it to reload. No, it would not.

Q: All right.

On redirect, Park testified:

Q: Okay. Now Counsel asked you about whether or not this weapon would fire if there was a round in the chamber but the magazine was gone.

A: Yes, sir.

Q: And you told him that it would fire and eject?

A: Yes.

Traditionally, counsel for both sides have been afforded considerable latitude in presenting their closing arguments and have the right to discuss fully, from their respective standpoints, the evidence, inferences and deductions arising from the evidence. *State v. Pizzuto*, 119 Idaho 742, 752, 810 P.2d 680, 690 (1991). The role of the prosecutor is to present the State's case earnestly and vigorously, using every legitimate means to bring about a conviction, but also to see that justice is done and that every criminal defendant is accorded a fair trial. *State v. Reynolds*, 120 Idaho 445, 449, 816 P.2d 1002, 1006 (Ct. App. 1991).

However, we also "expect jurors to bring with them to jury service their background, knowledge and experience." *Miller v. Haller*, 129 Idaho 345, 350, 924 P.2d 607, 612 (1996); *see also* ICJI 104. Such information is not considered extraneous information. *Miller*, 129 Idaho at 350, 924 P.2d at 612. Indeed, we encourage jurors to use their life experiences when evaluating testimony. ICJI 104. Here, the jurors were instructed to rely on their background and experiences when evaluating testimony. While the prosecutor should have used different language, in this instance he did nothing more than encourage the jurors to discuss the testimony of the firearms expert, relying on their collective experiences. A review of the trial transcript reveals that the prosecutor simply recited facts in evidence, and called on jurors to use their life knowledge to evaluate the testimony. He did not, as Payne suggests, instruct any member of the

17

jury to act as an expert. Therefore, the remark was within the latitude afforded to the prosecution during closing arguments and Payne's counsel was not ineffective for failing to object to this single remark in the closing argument.[8]

Payne also argues that his counsel was ineffective for failing to object to the prosecution making inconsistent arguments regarding Payne's suicide attempts. He asserts that in pre-trial motions to suppress the black letter the prosecution argued that his suicide attempt in Eugene was genuine. Then, during closing arguments, the prosecutor suggested that the attempt was not genuine. Making these inconsistent arguments, Payne maintains, violated his right to due process.

This Court has not yet dealt with whether a prosecutor arguing inconsistent theories violates a defendant's right to due process. However, the Court of Appeals recently examined this issue. In *State v. Sanchez*, it pointed out that to "violate due process, an inconsistency must exist at the core of the prosecutor's cases against [two or more] defendants accused of the same crime." 142 Idaho 309, 322, 127 P.2d 212, 225 (2005) (citing *Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir. 2000)). Moreover, arguing inconsistent theories will only violate a defendant's due process rights if the prosecutor knowingly uses false evidence or acts in bad faith when trying *two defendants*, accused of the same crime, at *two separate trials*. *See Nguyen v. Lindsey*, 232 F.3d 1236, 1240 (9th Cir. 2000); *Groose*, 205 F.3d at 1050.

Payne's claim fails. Payne is the only defendant charged with the murder, rape, kidnapping and robbery of Maher. Thus, it is impossible for the prosecution to have used one theory against another defendant for this same crime during a different trial and then use another theory to try Payne. Therefore, the district court did not err in dismissing this claim on post-conviction.

Second, even if the Court were to expand this rule to somehow cover Payne's trial, the State never argued inconsistent theories that were the core of its case against Payne. Payne bases his arguments on exaggerated differences.[9]

---

[8] Additionally, decisions to object during closing arguments are tactical, and will not be second-guessed by this Court. *See State v. Hairston*, 133 Idaho 496, 513, 988 P.2d 1170, 1187 (1999).

[9] We do not decide today whether, in a case involving a single defendant, the State taking inconsistent positions in a pre-trial motion and during the jury trial could serve as the basis of a due process violation. Assuming *arguendo* that it could, a review of the State's statements reveals that it did not rely on inconsistent positions. When arguing whether the marital privilege applied, the State did not discuss whether Payne's attempt at suicide was genuine or merely a gesture; it does not even discuss the attempt. It simply used the context of the threatened suicide to

18

### c. Prosecutorial misconduct

Payne next asserts that by arguing inconsistent theories, the prosecutor committed misconduct which violated his due process rights. However, as just discussed, the prosecutor did not argue inconsistent theories, and therefore, the State did not violate Payne's due process rights. Thus, the district court did not err in dismissing Payne's post-conviction petition as to this claim.

### d. Meaningful opportunity to develop post-conviction claims

Payne argues the district court imposed unreasonable time constraints on his petition for post-conviction relief "effectively [forcing him] to raise claims even if they were not fully developed."

Pursuant to I.C. § 19-2719, which requires the filing of post-conviction petitions within forty-two days of the imposition of a death sentence, Payne filed his initial petition for post-conviction relief on July 10, 2002. The State then filed a motion to dismiss the petition on August 12, 2002. On May 29, 2003, the district court held a status conference. At this time, a transcript had still not been prepared. Then, on November 18, 2003, the district court set a deadline of January 4, 2004, for filing an amended petition based on the transcript being completed by November 24, 2003. On November 26, 2003, Payne filed a motion for an extension of time, which the court denied. Payne filed an amended petition for post-conviction relief on January 13, 2004, and then moved for an extension of time to file another amended petition. The court granted this motion, and Payne filed his second amended petition for post-conviction relief on the deadline, March 26, 2004.

The decision to grant or deny a motion for continuance is within the discretion of the judge. *State v. Wood*, 132 Idaho 88, 106, 967 P.2d 702, 720 (1998). When reviewing a

---

highlight how Payne had done nothing to protect the confidentiality of the letter. It noted the fact that Payne was threatening suicide, and that if he had been successful his wife would not have been the first or only person to see the black letter. Then, during closing the State does not argue that Payne was not trying to commit suicide; instead it points out that the evidence presented at trial does not lead to a clear conclusion. These positions are consistent explorations of the facts. Payne did threaten suicide; he did not commit suicide. He left the Motel 6 and walked to an ambulance where he coherently answered questions. When he left, the letter was lying on the bed in plain sight and in no way concealed from view.

Moreover, these statements are not inconsistent with the position of the State during the sentencing phase. There, the State simply argued that the evidence showed that although Payne had threatened suicide and had taken aspirin, his actions indicated a suicidal gesture, rather than a genuine suicide attempt. Once again, the State was fully exploring the facts as presented.

discretionary decision, this Court determines "(1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the court reached its decision by an exercise of reason." *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989). Additionally, the denial of a motion for continuance is an abuse of discretion only if the defendant can show his substantial rights have been prejudiced. *Wood*, 132 Idaho at 106, 967 P.2d at 720.

Here, the district court did not abuse its discretion. It recognized that the decision to grant an extension of time was within its discretion, it acted within the bounds of applicable legal standards, and it reached its decision through an exercise of reason. Payne had nearly twenty-two months from the date of his sentencing to the date he filed his second amended petition. This Court has found that "nearly a year" was adequate time to prepare a petition for post-conviction relief when there was no indication that the defense was deprived of adequate time or funds to properly prepare. *Wood*, 132 Idaho at 107, 967 P.2d at 721. Also, in a case similar to the case at bar, this Court found no abuse of discretion when the defendant had nearly two years to prepare her petition for post-conviction relief and had received several extensions of time. *State v. Row*, 131 Idaho 303, 311, 955 P.2d 1082, 1090 (1998). Likewise, in this instance Payne had adequate time to prepare his petition and had already received extensions on the court's deadlines. Therefore, the district court's denial of the additional continuance was not an abuse of discretion.

### e.  I.C. § 19-2719

Payne argues that I.C. § 19-2719, which imposes a forty-two day time limit for filing post-conviction claims in capital cases, violates equal protection and due process because it treats capital defendants differently than non-capital defendants and because that statute makes it nearly impossible for a capital defendant to raise "extra-record claims" in post-conviction proceedings.

Recently, in *Hairston v. State*, 144 Idaho 51, __, 156 P.3d 552, 557 (2007), this Court was invited to review its holding that I.C. § 19-2719 was constitutional. Once again we

20

reiterated that I.C. § 19-2719 does not violate the equal protection or due process rights of capital defendants. *Id*. There, Justice Trout wrote:

> We have previously considered and rejected arguments that the disparate treatment of capital defendants under I.C. § 19-2719 violates their equal protection and due process rights. In *State v. Beam*, 115 Idaho 208, 766 P.2d 678 (1989), this Court held that the 42-day time limit imposed on capital defendants survived rational basis review and did not violate a defendant's constitutional right to equal protection. *Id*. at 213, 766 P.2d at 683. In *Rhoades*, the Court approved *Beam's* equal protection analysis and addressed a due process challenge to the statute's 42-day time limit. [*State v*.] *Rhoades*, 120 Idaho [795] at 806, 820 P.2d [665] at 676 (1991). "The legislature has seen fit," the Court explained, "to appropriately limit the time frame within which to bring challenges which are known or which reasonably should be known." *Id*. at 807, 820 P.2d at 676. Evaluating the statute's procedural safeguards under the balancing test in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1950), the Court concluded that "I.C. § 19-2719 is not unconstitutional under due process analysis." *Id*.

*Id*. The Court then found that there was no reason to reverse its previous holdings. *Id*.

Likewise, we find no reason here to reverse our previous rulings that I.C. § 19-2719 is constitutional.

### 3. Cumulative error

Finally, Payne argues that even if none of the errors complained of merit relief, the accumulation of errors should lead this Court to conclude that he was denied a fair trial.

When there is an "accumulation of irregularities, each of which by itself might be harmless, but when aggregated, the errors show the absence of a fair trial," the cumulative error doctrine requires a reversal of the conviction as the trial has contravened the defendant's right to due process. *State v. Field*, 144 Idaho 559, __, 165 P.3d 273, 286-87 (2007) (quoting *State v. Moore*, 131 Idaho 814, 823, 965 P.2d 174, 183 (1998)). Here, there was no guilt phase error, let alone an aggregate of harmless errors. Thus, we will not reverse Payne's conviction based on the cumulative error doctrine.

## B. Sentencing phase

Payne claims there was error during the sentencing phase of his trial and that his counsel was ineffective. Additionally, the State cross-appeals the district court's order granting Payne a resentencing trial based on *Ring* error. We find that, unlike the guilt phase, Payne's sentencing trial contained reversible errors, and we vacate Payne's sentence. However, although we vacate Payne's sentence and order a new sentencing trial, we "shall pass upon and determine all

21

questions of law involved in the case presented upon such appeal, and necessary to the final determination of the case." *State v. Odiaga*, 125 Idaho 384, 388, 871 P.2d 801, 805 (1994); *see also* I.C. § 1-205. We will address each of the issues Payne presents on appeal to provide guidance on remand.

    1. Sentencing hearing

Payne argues the district court erred by applying an overly restrictive definition of mitigation when determining his sentence, erred by allowing the State's mental health experts to testify and erred by considering inadmissible victim impact evidence. We turn first to the definition of mitigation used by the district court.

    *a. Definition of mitigation*

Payne argues that the district court applied an overly restrictive definition of mitigation, which resulted in its "failure to consider all relevant mitigating circumstances, distorted [its] weighing process, and ultimately led to the imposition of the death penalty." Payne asserts that the district court failed to properly weigh the mitigating evidence, and that the district court overlooked relevant mitigating evidence showing mental health conditions by requiring a nexus between the condition and the commission of the crimes. While acknowledging the expansive nature of mitigation and that there need not be a nexus between mental health evidence and the crime, the State maintains that the district court properly considered all the evidence and found that the aggravating circumstances outweighed the mitigating circumstances.

In its written findings, the district court found that although Payne had depression, it was not severe, "did not cause the defendant to rape or murder Samantha Maher and was not an important factor in this case." It also found that Payne had two paraphilias, voyeurism and exhibitionism, but that these deviations were not compulsions and Payne "had the ability to choose whether to rape or to murder and was not compelled to rape by virtue of a compulsion." Likewise, the district court discounted Payne's history of head trauma and allergy to aspirin, finding they did not lessen his ability to choose or cause his choice to kidnap, rape and murder.[10]

> When reviewing a district court's findings and analysis of mitigating and aggravating factors, we must review the record of the district court's findings to determine whether the district court met the mandates of I.C. § 19-2515. We

---

[10] During the sentencing hearing, the prosecution questioned each of Payne's mental health witnesses as to whether his conditions caused the rape and murder; therefore, the statements in the district court's imposition of sentence may be a finding on the evidence presented. Nevertheless, we emphasize that such questions would be improper on remand.

specifically must determine: (1) whether the district court overlooked or ignored any raised mitigating factors; (2) whether the evidence supports the aggravating factors found; and (3) whether the district court properly weighed all of the factors. We are not to reweigh the factors. Rather, we are only to determine if there is evidence to support the aggravating factors and whether the weighing process properly was done.

*State v. Porter*, 130 Idaho 772, 788, 948 P.2d 127, 143 (1997) (internal citations omitted).

Payne argues that the alleged misweighing by the judge should be subject to structural error analysis. Structural error is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). Conversely, errors that may be "quantitatively assessed in the context of other evidence presented" are subject to a harmless error analysis. *Id*. at 308; *see also Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993). Here, the alleged misweighing of the mitigating evidence did not affect the framework of the sentencing itself; rather, such error may be assessed in the context of the other mitigating and aggravating evidence presented. As such, it is reviewed for harmless error.

Here, the district court did not properly weigh Payne's mental health evidence. Its opinions (both on sentencing and post-conviction relief) show that the court considered the mental health evidence only in the context of whether there was a nexus between Payne's mental health and the crimes. Yet, mental health evidence is relevant to mitigation even where there is not such a nexus. *Smith v. Texas*, 543 U.S. 37, 45 (2004); *Tennard v. Dretke*, 542 U.S. 274, 285-288 (2004).

Nonetheless, in light of all the evidence and testimony produced during both the trial and sentencing hearing, we find that there is no reasonable possibility the district court would have reached a different sentence had it not analyzed the mental health evidence only in the nexus context. As such, the error by the district court is harmless.

### b. Admission of State's experts' opinions

Below, Payne sought to exclude from consideration at sentencing his pre-trial statements to Drs. Engle and Estess, the State's expert witnesses, on the basis that I.C. § 18-207 is unconstitutional when applied to capital cases. However, the district court found that I.C. § 18-207 is constitutional. It also found Payne was

on notice that his Fifth Amendment rights are waived when he puts his mental condition in issue at sentencing. The [court] will permit the use of the statements for purposes of cross-examination of the defendant or his experts and will further

23

permit the use of the statements by the State in rebuttal. The use of those statements is subject to the usual rules of evidence.

Then, during the sentencing hearings Payne called Drs. Gummow and Rogers as witnesses, and they testified extensively to his mental health. The State then called Drs. Engle and Estess as witnesses.

On appeal, Payne argues that I.C. § 18-207(4)(c) violates his Eighth Amendment rights because it limits the presentation of relevant evidence during mitigation. He asserts that this section is unconstitutional when applied to the sentencing phase of capital cases "because it conditions the presentation of mitigation upon waiving Fifth and Sixth Amendment privileges." He also contends that the district court erred by not applying I.C. §§ 18-215 and 19-2522 to prohibit the use of Payne's pre-trial statements to Drs. Engle and Estess during the sentencing phase of his trial. The State argues there is no distinction between relying on mental health evidence during the guilt phase and relying on it during sentencing; therefore, the tactical decision to present mental health evidence and waive certain rights is not unconstitutional. Additionally, the State asserts the Court should not address Payne's arguments as to I.C. §§ 18-215 and 19-2522, as these are presented for the first time on appeal. We will turn first to the constitutionality of I.C. § 18-207.

Idaho Code § 18-207(4)(c) provides:

(4) No court shall, over the objection of any party, receive the evidence of any expert witness on any issue of mental condition, or permit such evidence to be placed before a jury, unless such evidence is fully subject to the adversarial process in at least the following particulars:

. . . .

(c) Raising an issue of mental condition in a criminal proceeding shall constitute a waiver of any privilege that might otherwise be interposed to bar the production of evidence on the subject and, upon request, the court shall order that the state's experts shall have access to the defendant in such cases for the purpose of having its own experts conduct an examination in preparation for any legal proceeding at which the defendant's mental condition may be in issue.

The Eighth Amendment requires that a defendant be allowed to present all relevant evidence in mitigation. The Federal Constitution "requires States to allow consideration of mitigation evidence in capital cases. Any barrier to such consideration must therefore fall." *McCoy v. North Carolina*, 494 U.S. 433, 442 (1990) (emphasis removed).

24

Here, however, the court did not bar the presentation of relevant mitigation evidence, it merely conditioned the presentation of the mental health evidence on the waiver of privilege found in I.C. § 18-207(4)(c).  The issue for this Court, then, is whether the choice between not presenting mental health evidence or presenting mental health evidence at sentencing but waiving Fifth Amendment privileges as presented by I.C. § 18-207(4)(c) is constitutional.  We hold that it is constitutional.

The Supreme Court of the United States has never directly addressed this issue.  However, it has examined similar issues.  It has held that during the trial phase, the State may constitutionally require a defendant to submit to a mental health exam and present the evidence gleaned from the exam; however, *Miranda v. Arizona*, applies to the examination.  *Estelle v. Smith*, 451 U.S. 454, 468-69 (1981).  In *Estelle*, the trial court had *sua sponte* ordered the psychiatric exam and the defendant did not put his mental status at issue.  The Court held that a defendant, "who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence," may be compelled to proceed with a competency examination, but statements made during the examination cannot be used against him during a capital sentencing proceeding.  *Id*. at 468.  The Court left open the question of whether a defendant could be compelled to be examined by the prosecution's expert if he chose to present psychological evidence at sentencing.  *Id*. at 466 n.10.  The Court has also held, in a non-capital case, that a defendant who raises mental status as a defense waives his Fifth Amendment privilege against self-incrimination.  *Buchanan v. Kentucky*, 483 U.S. 402, 423 (1987).  There, the Court noted that its statement in *Estelle* logically led to the proposition that "if a defendant requests [a mental health evaluation] or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from reports of the examination that the defendant requested."  *Id*. at 422-23.

In *Bonin v. Calderon*, 59 F.3d 815 (9th Cir. 1995), the Ninth Circuit was presented with an argument similar to Payne's.  There, the defendant argued that the prosecution's presentation of evidence from other murders for which he had not yet been tried during the penalty phase of another murder case presented him with a "Hobson's choice" to remain silent during the presentation of mitigating evidence or to testify and have that testimony used against him in the other cases.  *Id*. at 839.  The court noted that "[t]he criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course

to follow . . . . Although a defendant may have a right, even of constitutional dimension, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." *Id*. (alteration in original). In such a situation, "[t]he threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved." *Id*. (alteration in original).

A state can constitutionally condition a defendant's decision to present psychological evidence during the guilt phase of his trial on his waiving constitutional rights. *Buchanan*, 483 U.S. at 422-23. Likewise, a State can present evidence of charged, but un-tried, criminal acts during the sentencing phase of a capital murder presenting a defendant with the choice to testify at both trials or remain silent at both trials. *Bonin*, 59 F.3d at 840. It follows, then, that a state may condition a defendant's decision to present such evidence during the sentencing phase of his trial without running afoul of the constitution. Therefore, we hold that I.C. § 18-207(4)(c) is constitutional when applied to capital sentencing proceedings.

Payne next argues that the district court erred in not applying I.C. §§ 18-215 and 19-2522 to the sentencing proceedings. He asserts that because he withdrew his intent to rely on a mental condition at trial, I.C. § 18-207 was no longer applicable and I.C. §§ 18-215 and 19-2522 should have controlled at sentencing. Moreover, since he was only relying on his mental condition as mitigating evidence, he argues that the State was not entitled to examine Payne or rely on its experts' testimony to support the imposition of the death penalty. The State argues that this Court cannot reach these issues, as Payne did not raise them below. Additionally, it asserts I.C. §§ 18-215 and 19-2522 are inapplicable and do not limit the admission of Payne's statements to the State's experts.

First, the State's argument that this Court should not consider Payne's statutory arguments must fail. This Court must address Payne's statutory arguments pursuant to I.C. § 19-2827. *State v. Osborn*, 102 Idaho 405, 410-11, 631 P.2d 187, 192-93 (1981).

Idaho Code § 19-2522 provides that if there "is reason to believe the mental condition of the defendant will be a significant factor at sentencing . . . the court shall appoint at least one (1) psychiatrist or licensed psychologist to examine and report upon the mental condition of the defendant." I.C. § 19-2522(1). It also provides that the report shall include

(a) A description of the nature of the examination;

(b) A diagnosis, evaluation or prognosis of the mental condition of the defendant;

26

(c) An analysis of the degree of the defendant's illness or defect and level of functional impairment;

(d) A consideration of whether treatment is available for the defendant's mental condition;

(e) An analysis of the relative risks and benefits of treatment or nontreatment;

(f) A consideration of the risk of danger which the defendant may create for the public if at large.

I.C. § 19-2522(3). However, this section does not limit the consideration of relevant evidence during the imposition of sentence. I.C. § 19-2522(6).

Idaho Code § 18-215 provides:

A statement made by a person subjected to psychiatric or psychological examination or treatment pursuant to sections 18-211, 18-212 or 19-2522, Idaho Code, for the purposes of such examination or treatment shall not be admissible in evidence in any criminal proceeding against him on any issue other than the defendant's ability to assist counsel at trial or to form any specific intent which is an element of the crime charged, except that such statements of a defendant to a psychiatrist or psychologist as are relevant for impeachment purposes may be received subject to the usual rules of evidence governing matters of impeachment.

Neither I.C. § 19-2522 nor I.C. § 18-215 work to make inadmissible the statements Payne made to the State's experts during his I.C. § 18-207 examination. By its very terms, I.C. § 19-2522 does not limit the consideration of other relevant evidence. I.C. § 19-2522(6).[11] Additionally, I.C. § 18-215 limits the admissibility only of statements made during examinations pursuant to three specific statutory sections. The examinations here were done pursuant to I.C. § 18-207, and I.C. § 18-215 does not speak to that statute. Therefore, I.C. § 18-215 cannot work to limit the admissibility of the statements Payne made to Drs. Engle and Estess.

Thus, since I.C. § 18-207 does not violate the Eighth Amendment, and I.C. §§ 18-215 and 19-2522 do not limit the admissibility of the statements Payne made to the State's experts, we hold that the district court did not err in allowing their admission during the sentencing hearing.

*c. Victim impact evidence*

---

[11] While the district court could have ordered an examination pursuant to the mandatory terms of I.C. § 19-2522(1), any error is harmless. Five mental health experts testified at Payne's sentencing and all of the elements that a report must include under I.C. § 19-2522(3) were covered by the experts. Therefore, it would be unreasonable to assume that an additional report specifically prepared pursuant to I.C. § 19-2522 would have changed the district court's sentencing determination.

27

Payne appeals the issue of whether the admission of "inflammatory" and inadmissible victim impact statements violated his constitutional rights.[12]  He argues that the "thinly veiled" sentencing recommendations and numerous characterizations and opinions offered about Payne and the crime both during the testimony and in the letters attached to the PSI were all inadmissible under *Booth v. Maryland*, 482 U.S. 496 (1987).[13]  He also contends that the "emotionally laden and detailed presentation[s]" during the victim impact statements violated his rights under *Payne v. Tennessee*, 501 U.S. 808 (1991).  Finally, Payne maintains that the comments regarding his silence and demeanor at trial and the "appeals to religious authority as a source of law for imposing the death penalty" were improper.  The State acknowledges portions of the victim impact statements violated Payne's rights, but fails to delineate which statements do so.  While the State agrees that the victims' statements offering characterizations and opinions about the crime, the defendant and the appropriate punishment violated Payne's rights, it maintains that the inadmissible statements were not relied on by the district court when it fashioned Payne's sentence and that the statements are, therefore, harmless.

Victim impact evidence provides only two types of information: (1) it describes the characteristics of the victim and the emotional impact of the crime on the family; and (2) it sets forth the family members' opinions and characterizations of the crime and the defendant.  *Booth*, 482 U.S. at 502.  The Eighth Amendment does not erect a per se bar prohibiting the consideration of victim impact statements in a capital case.  *Payne*, 501 U.S. at 827.  States may show "a quick glimpse of the life [the defendant] chose to extinguish."  *Id*. at 830 (O'Connor, J. concurring).  However, while evidence relating to the victim's personal characteristics and the impact of the crime on the murder victim's family is admissible, characterizations and opinions about the crime, the defendant and the appropriate sentence are not admissible.  *State v. Lovelace*, 140 Idaho 73, 80, 90 P.3d 298, 305 (2004); *see also Payne*, 501 U.S. at 830 n.2.  Additionally, references to or arguments using religious authority as the basis for punishment is improper and have been condemned by virtually every court to consider their use.  *Sandoval v. Calderon*, 241 F.3d 765, 776-77 (9th Cir. 2000).  This is so because the death penalty may only be imposed when the fact finder carefully focuses on the specific statutory factors and because reference to religious authority undermines the fact finder's role and sense of responsibility in

---

[12] Payne did not object to the comments at issue below.

28

sentencing a defendant to death. *Id.* Nevertheless, although certain types of victim impact evidence are admissible, if victim impact evidence is introduced that is "so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne*, 501 U.S. at 825.

Attached to the PSI were an excessive number of letters from family members and friends, many of which stated the author's opinions about Payne, his character and the crime. Additionally, numerous family members and friends testified at the sentencing hearing and gave their opinions about Payne, his character and the crime. During the *full day* of victim impact testimony, witnesses described Payne as evil, a waste of aspirin, a sociopath, a cold-blooded killer, unremorseful, a predator, cold and calculating, not a man, not even human, selfish, a coward, a pathetic monster, a wimp and a man without a conscience. Witnesses also expressed their wishes that Payne "rot in hell," "burn in hell" or be tortured. One witness noted Bible passages he wished the court to consider; each passage called for death for a certain crime.[14] These statements are characterizations and opinions about Payne, the crime, his appropriate punishment, and calls to religious authority as the basis for punishment; as such, none of these statements were admissible.

Nonetheless, the Court's inquiry does not end with the determination that inadmissible evidence was presented. Rather, the admission of these types of victim impact statements is reviewed for harmless error. *Fain*, 119 Idaho at 673, 809 P.2d at 1152; *see also Lovelace*, 140 Idaho at 80-81, 90 P.3d at 305-06. The test to determine harmless error is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction, *Fahy v. Connecticut*, 375 U.S. 85, 86-87 (1963), and the court must be able to declare a belief that it was harmless beyond a reasonable doubt, *Chapman v. California*, 386 U.S. 18, 24 (1967); *Fain*, 119 Idaho at 673, 809 P.2d at 1152. To hold error harmless, the Court "must declare a belief, beyond a reasonable doubt, that there was no reasonable possibility that such evidence

---

[13] *Booth* was subsequently overruled by *Payne v. Tennessee,* 501 U.S. 808 (1991).

[14] This witness stated: "As in the Good Book there's some scripture numbers I'd like to put into the record but I will not read them. Numbers 35:16, Deuteronomy 24:7, and the two special young women [Payne raped in Barber Park, Deuteronomy] 22:25." Numbers 35:16 states, "If a man strikes someone with an iron object so that he dies, he is a murderer; the murderer shall be put to death." Deuteronomy 24:7 states, "If a man is caught kidnapping one of his brother Israelites and treats him as a slave or sells him, the kidnapper must die. You must purge the evil from among you." Deuteronomy 22:25 states, "But if out in the country a man happens to meet a girl pledged to be married and rapes her, only the man who has done this shall die."

complained of contributed to the conviction." *State v. Sharp*, 101 Idaho 498, 507, 616 P.2d 1034, 1043 (1980).

This Court has presumed that sentencing judges are "able to sort out truly relevant, admissible evidence presented in the form of victim impact statements." *Lovelace*, 140 Idaho at 81, 90 P.3d at 306. In its Memorandum Decision and Order on Payne's petition for post-conviction relief, the district court noted that "[t]here is no indication that this [court] relied on any inadmissible evidence . . . ." when sentencing Payne and that "[t]here is no factual basis upon which to allege that this [court's] passion was 'inflamed' by Victim Impact Statements."

Nevertheless, at the time of sentencing, the district court understood only that those statements advocating a certain punishment ran afoul of the Eighth Amendment. The record shows that it was not aware and was not advised that statements opining about the crime or the defendant's character were also inadmissible. Moreover, in its Memorandum Decision and Order on Payne's petition for post-conviction relief, the district court stated that the victim impact statements were "largely appropriate and acceptable under *Payne*. . . " and "very little of the testimony characterized [Payne] beyond the evidence which had already been presented during the guilt phase and which was available to this [court] for consideration in sentencing." Finally, the district court also stated that there was no showing it had considered any redacted statements in the letters attached to the PSI. However, the only portions of the letters attached to the PSI which were redacted were those that recommended a sentence; none of the remaining inadmissible statements in the letters were redacted.

Considering the nature and high volume of the victim impact statements, even in light of the presumption, the statements by the district court show there is reasonable doubt as to whether the inadmissible evidence contributed to Payne's sentence. None of the characterizations of Payne and his crime were presented during the guilt phase, and none were admissible at sentencing. While testimony surrounding Maher's good character and the emotional impact her murder had on her friends and family is not barred under *Payne*, the numerous characterizations of Payne, the crime and the appropriate punishments are barred. Examining the oral order and the written opinion shows the district court did not recognize this either at the time of sentencing or later when examining Payne's petition for post-conviction relief. Indeed, the court's written decisions indicate a belief that all inadmissible evidence had been redacted, but this is not the

case. Therefore, because there is a reasonable doubt as to whether the evidence contributed to Payne's sentence, we vacate Payne's sentence and remand for resentencing.

2.  Post-conviction

Because this matter will be remanded for resentencing, we will address Payne's post-conviction arguments in order to provide guidance to the court on remand.

### a. Victim Impact Evidence

Payne argues that his trial counsel was deficient by failing to preclude inadmissible victim impact statements, by failing to limit the volume of the victim impact statements and by failing to limit the statements to those of immediate family members pursuant to I.C. § 19-5306. We have already addressed the admissibility and volume issues and need not reiterate the contours of the volume and type of victim statements which are admissible, but we will address Payne's statutory argument.

Idaho Code § 19-5306 provides many rights to victims, including that each victim of a crime shall be heard, upon request, at sentencing. I.C. § 19-5306(1)(h). The statute defines a victim as "an individual who suffers direct or threatened physical, financial or emotional harm as the result of the commission of a crime or juvenile offense." I.C. § 19-5306(5)(a). It applies the rights "equally to the immediate families of homicide victims[,]" and the court has the discretion to designate a representative from the immediate family members to exercise the rights provided in that section on behalf of the deceased victim. I.C. § 19-5306(3).

The issue of whether the language of I.C. § 19-5306(3), (5)(a) limits victim impact statements to immediate family members in homicide cases is an issue of first impression for this Court. The interpretation of a statute is a question of law over which this Court exercises free review. *State v. Thompson*, 140 Idaho 796, 798, 102 P.3d 1115, 1117 (2004). The objective of statutory construction is to derive the intent of the legislature. *Kelso & Irwin, P.A. v. State Ins. Fund*, 134 Idaho 130, 134, 997 P.2d 591, 595 (2000). Statutory construction begins with the literal language of the statute. *D & M Country Estates Homeowners Assoc. v. Romriell*, 138 Idaho 160, 165, 59 P.3d 965, 970 (2002). The Court "will not deal in any subtle refinements of the legislation, but will ascertain and give effect to the purpose and intent of the legislature, based on the whole act and every word therein, lending substance and meaning to the provisions." *Ada Co. Assessor v. Roman Catholic Diocese of Boise*, 123 Idaho 425, 428, 849 P.2d 98, 101 (1993).

In this instance, we hold that I.C. § 19-5306 limits victim impact statements to immediate family members. First, reading the entire statute makes it clear that the legislature intended to limit the definition of "victim" by providing that a victim must have suffered direct harm as a result of the commission of the crime. I.C. § 19-5306(5)(a). Additionally, in cases of homicide, it extends the right to make a statement only to immediate family members. I.C. § 19-5306(3). When read together, the meaning is clear: the legislature intended to limit the right to be heard to only immediate family members.

However, the legislature did not define "immediate family members" in this section. Nonetheless, it has elsewhere provided definitions. For instance, in I.C. § 41-1325, "'immediate family member' means a parent, mother-in-law, father-in-law, husband, wife, sister, brother, brother-in-law, sister-in-law, son-in-law, daughter-in-law, or a son or daughter." Likewise, in I.C. § 44-1601, "'[i]mmediate family member' means the spouse, children, brother, sister, mother or father." Similarly, Black's defines "immediate family member as: "1. A person's parents, spouse, children, and siblings. 2. A person's parents, spouse, children, and siblings, as well as those of the person's spouse." Black's Law Dictionary 273 (2d Pocket Ed. 2001).

As such, the victim impact statements given by those who were not Maher's immediate family members were not admissible. However, we need not decide whether Payne's counsel was ineffective for failing to limit these statements as we have already determined that Payne must be resentenced.

### b. I.C. § 18-207 notice

Payne contends that his trial counsel was ineffective by prematurely filing a notice of intent to rely on a mental defense, by failing to be present during the State's experts' examinations of Payne, and by failing to ensure that Payne was present when the prosecution, defense counsel and district judge discussed the procedures for the examinations. Payne argues that but for these errors, he would not have made the highly inflammatory statements to Drs. Estess and Engle, and that without their testimony there is a reasonable probability his sentence would have been less than death.[15]

---

[15] Payne does not contend on appeal that he would not have been found guilty if his counsel had decided to present mental condition evidence at trial; instead he argues that he was prejudiced at sentencing by the decision to file notice under I.C. § 18-207.

Turning first to Payne's argument that his counsel was ineffective by prematurely filing a notice of intent pursuant to I.C. § 18-207, we hold that his counsel was not ineffective. Trial counsel was required by I.C. § 18-207(4)(a) to provide notice of Payne's intent to rely on mental condition evidence at least ninety days prior to trial "or such other period as justice may require[.]" Payne's counsel provided notice on March 12, 2001, and then filed a motion contesting the constitutionality of I.C. § 18-207 the following day.[16] In order to rule on that motion prior to trial, the district court granted Payne's motion to continue the jury trial and reset the trial for September 2001. The district court issued an order finding I.C. § 18-207 was constitutional on June 1, 2001. On July 13, 2001, 66 days before trial, the district court ordered the defense to provide the State's experts access to Payne. This order was issued after Payne's counsel, the prosecution and the district court agreed to the scope of the examination. It provided that mental health experts of the State's choosing were to have access to Payne for an examination to evaluate his mental condition. It also provided: "The mental health experts . . . are allowed to discuss any subject with the defendant that, in their professional judgment, is believed to be reasonably necessary to a thorough evaluation of defendant's mental health status." The district court also indicated that it would take up defense arguments as to the scope of the exam and the admissibility of the experts' opinions after the experts completed their examinations.

After the examinations, which elicited incriminating statements and evidence from Payne, trial counsel withdrew the notice to rely on mental condition evidence on August 20, 2001. Payne's trial then commenced on September 17, 2001, 182 days after the I.C. § 18-207 notice.

Here, trial counsel's decision whether to rely on a mental health defense was tactical. *See Bagshaw*, 142 Idaho at 38, 121 P.3d at 969 ("It is generally agreed that the decision of what evidence should be introduced at trial is considered strategic or tactical.") (citing American Bar Association Standards for Criminal Justice 4-5.2). While counsel later withdrew the notice and did not rely on mental condition evidence, such a decision was made after Payne made damaging statements to the State's experts, and just a few days before trial.

---

[16] It is unclear how Payne would have had standing to challenge the constitutionality of I.C. § 18-207 unless he had given notice. However, neither of the parties addresses this point.

Given this series of events, Payne's counsel was faced with another tactical decision. They could continue with the plan to present a defense based on Payne's mental health and allow the State to present very damaging evidence through expert witness testimony or they could withdraw their notice and no longer rely on a mental condition defense. That they made one tactical decision, and then later changed it cannot be second-guessed by this Court.[17] Additionally, even if such decisions were not tactical, it is virtually inconceivable that Payne could show prejudice in this instance. That he made damaging statements to the State's experts is in no way related to the timing of his trial counsel's decision to provide notice.

Payne next argues that his trial counsel's failure to advise him of his rights prior to the examinations and to be present during the examinations by the State's witnesses fell below a reasonable standard. Payne asserts that even if he waived the right to counsel through I.C. § 18-207, such a waiver was limited and his counsel should have so advised him. Finally, without providing any support for the proposition, Payne maintains that his counsel should have instructed him not to answer questions regarding the Barber Park and Maple Grove incidents, as questions about his other crimes were not necessary to his mental health evaluation.

Payne's counsel appeared before the exam and told him to answer the questions. Payne's counsel did not attend the exam, nor did they advise him in any other way regarding the questioning.

A defendant has a privilege against self-incrimination. *Odiaga*, 125 Idaho at 391, 871 P.2d at 808 (superseded by statute). Nonetheless, when a defendant announces an intent to assert a mental health defense, a court ordered mental examination does not violate the right against self-incrimination. *State v. Santistevan*, 143 Idaho 527, 529, 148 P.3d 1273, 1275 (Ct. App. 2006) (noting that virtually all federal and state appellate courts to have considered this issue have so held); *see also Estelle*, 451 U.S. at 465 ("When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case."). However, a defendant has the right to the assistance of counsel, as opposed to the presence of

---

[17] Additionally, there is no support for Payne's contention that the examinations were not mandatory. At the time the examinations were done, Payne was still bound by the I.C. § 18-207 notice; it had not yet been withdrawn. He was also under a court order to answer all the questions. As such, his examination was "mandatory." His argument, however, seems to be that because his I.C. § 18-207 notice was withdrawn after the exam the exam itself was not mandatory. This is nonsensical.

counsel, during a compelled mental examination. *Estrada v. State*, 143 Idaho 558, 563, 149 P.3d 833, 838 (2006). This right is based on the Sixth Amendment. *Id*. at 562, 149 P.3d at 837; *Estelle*, 451 U.S. at 470.

Here, since Payne had announced his decision to rely on mental health evidence, pursuant to I.C. § 18-207(4)(c), he waived any privilege against self-incrimination. Moreover, the order compelling Payne to attend the mental health examinations specifically provided the exams were to include a discussion of any subject the mental health experts believed, based on their professional opinion, to be reasonably necessary to thoroughly evaluate Payne's mental health status; it also provided that the district court would determine the admissibility of any statements Payne made during the examination after a hearing.

Thus, his counsel could not have been ineffective for the now-claimed failure to advise him to not answer certain questions. Put another way, it was reasonable for his counsel, in light of both I.C. § 18-207 and the court order, to take the exact course of action they did. They advised Payne to follow a court order and to comply with a statute. In fact, Payne's counsel went farther than that, objecting to the entire exam pursuant to I.C. § 18-207. However, once the district court ruled that I.C. § 18-207 was constitutional, counsel took additional steps to preserve Payne's rights. They required that the examination be videotaped to allow them to later raise any objections to the State's experts' testimony and reserved the right to later object to any testimony the experts might offer based on the two incidents. Such advice and actions cannot be deemed unreasonable.

Moreover, even assuming that his counsel's conduct fell below a reasonable standard, Payne has failed the second prong of the *Strickland* analysis, as he failed to show prejudice. First, Payne was subject to a court order compelling him to answer questions and leaving the admissibility of his statements open to determination after the examination. Thus, even if counsel had been present during the exams and had advised Payne to remain silent in the face of certain questions, it is likely that Payne would have had to eventually answer those questions to complete the examinations.[18] Second, though Payne argues that the exams should not have included questions about the Maple Grove and Baber Park incidents, he has failed to provide any support for the notion that discussion of these incidents was outside the bounds of what was

---

[18] Indeed, Payne's counsel decided to be available during the exam, but not to attend the exam to avoid the possibility of becoming a witness.

35

necessary to complete a mental health exam. Indeed, his own experts testified regarding these incidents. Additionally, prior to the sentencing hearing his counsel sought to exclude statements Payne made to the State's experts regarding these incidents. That the district court denied the motion does not make his counsel ineffective and does not demonstrate prejudice.

Finally, Payne argues that he should have been present during the in-chambers discussion between his counsel, the prosecution and the judge when the procedure for the examinations by the State's experts was discussed. Although Payne was not present during this in-chambers discussion, his counsel, the prosecution and the judge all returned to the courtroom immediately following their meeting. In Payne's presence, the district court recited the conversation to Payne and there was no further input or objection from counsel. The court also specifically allowed Payne to ask questions, but he remained silent. Additionally, there were no limitations placed on Payne or his attorney, thus further discussions between the two could take place on any subject discussed in chambers.

Here, Payne has failed to show how he was prejudiced by not being present during the in-chambers conversation. Even assuming that a discussion as to the scope and procedure of the exam were a critical stage, the court gave Payne ample opportunity after the conversation to address it with any concerns or questions he might have had regarding the examination. The district court did not enter the order governing the exam until after it had addressed Payne in open court and on the record. Therefore, there is no prejudice.

### c. Presentation of mitigation evidence

Payne argues that his trial counsel was ineffective during the sentencing phase of his trial. Specifically, he alleges that his counsel should have (1) humanized him through the testimony of additional friends and family, (2) presented persuasive evidence as to the nature of his mental illness, (3) explained better the significance of Rh compatibility as it relates to his mental state, (4) had Payne undergo a functional MRI or PET scan to identify abnormalities, (5) presented more testimony that Payne did not present a future danger if incarcerated, (6) rebutted or undermined Dr. Estess's testimony, (7) demonstrated better the authenticity of his suicide to show his remorse, and (8) advised him to allocute.

These arguments are nothing more than taking issue with his trial counsel's tactical and strategic choices. *See Row*, 131 Idaho at 313, 955 P.2d at 1092 (affirming dismissal of post-conviction petition alleging failure to adequately investigate and have defendant allocute, and

36

noting that counsel had conducted ordinary and reasonable discovery and the "fact that counsel could have done *more* does not mean that they did not do *enough*."). There is no indication in the record that any of these choices fell below a reasonable standard. Indeed, the record supports that trial counsel conducted a normal and reasonable investigation and presented evidence on each of these issues. The fact that they could have presented more evidence or more persuasive evidence does not mean that they gave Payne ineffective assistance.

### 3. Cumulative error

As he did for guilt phase error, Payne argues that even if none of the individual errors during the sentencing phase entitle him to relief, the accumulation of errors show that he was denied a fair sentencing trial. However, we vacate Payne's sentence, so we need not consider the cumulative error doctrine here.

## C. *Ring* error

In its cross-appeal, the State argues that the district court erred when it vacated Payne's death sentence on post-conviction relief. The State contends that the special verdict shows that the jury found statutory aggravating factors. The State argues that since the jury found Payne guilty of both felony murder and premeditated murder, it follows that the jury found Payne killed or intended a killing, and, therefore, the I.C. § 19-2515(h)(7) findings were found by a jury. Payne argues that the district court correctly granted him relief. He insists he is entitled to a jury sentencing because *Ring* error is structural, the judge did not rely exclusively on the jury's verdict and the jury did not unanimously find the intent element for the felony murder aggravator.

The Sixth Amendment entitles capital defendants "to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring,* 536 U.S. at 589. The effect of *Ring* was to convert statutory aggravating circumstances relevant to sentencing to "the functional equivalent of an element of a greater offense," *id.* at 609, which must be proved to a jury beyond a reasonable doubt, *id.* at 606-09; *Apprendi v. New Jersey*, 530 U.S. 466, 482-84 (2000). Thus, *Ring* rendered unconstitutional the sentencing scheme of I.C. § 19-2515 (2001), which required the trial judge to make the factual findings regarding the existence of aggravating circumstances. *State v. Lovelace*, 140 Idaho 53, 66-67, 90 P.3d 278, 291-92 (2003).

37

*Ring* requires that a jury find the statutory aggravating circumstances. 536 U.S. at 609. Here, we conclude beyond a reasonable doubt that the jury found the necessary aggravators to make Payne death eligible. At the time of Payne's trial, the statutory aggravators included:

> (6) By the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life.

> (7) The murder was committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, kidnapping or mayhem and the defendant killed, intended a killing, or acted with reckless indifference to human life.

I.C. § 19-2515(h)(6)-(7) (2000).

The district court gave the jury multiple verdict forms: "guilty" and "not guilty" verdict forms for each crime charged. The jury was instructed that it must decide each count separately and that each of its findings must be stated in a separate verdict form. Moreover, the jurors were instructed that to return a verdict, all twelve had to agree to the decision. There is no indication that the jury did not follow these instructions. The jury returned only the "guilty" verdict form for the murder charge. It provided:

> WE, The jury, sworn to try the above-entitled matter, find the defendant guilty of Count I, Murder In the First-degree, Felony. The finding that the defendant is guilty of Murder In the First-degree is based upon the finding or findings that the murder was committed (Check all spaces which apply):
>
> __With deliberation and premeditation
> __ In the perpetration of a kidnapping
> __ In the perpetration of a robbery
> __ In the perpetration of a rape

All four choices were checked and the verdict was signed by the foreman. Additionally, the jury found Payne guilty of first-degree kidnapping, robbery and rape. After the jury returned the verdict form, the jurors were polled and each stated the verdict form correctly represented the verdict. Thus, we determine beyond a reasonable doubt that the jury found facts sufficient to make Payne death eligible under I.C. § 19-2515(h)(7) (2000).

The next issue for the Court, then, is whether a judge or a jury should weigh the mitigating circumstances on remand. *Ring* instructs that the Sixth Amendment requires that a jury find any fact on which the legislature conditions an increase in their maximum punishment. 536 U.S. at 589. Under our statutory scheme, the finding of an aggravating circumstance is all that is necessary to increase a defendant's potential sentence to death; the consideration of this factor against all of the mitigating circumstances cannot increase the penalty. While the

38

legislature has now mandated that a jury examine all of the mitigating factors when determining whether it is just to impose the death sentence, the Sixth Amendment does not require that this inquiry be done by a jury. *See id.* In other words, it is the finding of an aggravating factor which makes a defendant death-eligible, and the examination of mitigating circumstances is done to select which death-eligible defendants are actually sentenced to death. *Oken v. State*, 835 A.2d 1105, 1122 (Md. 2003). Thus, in this case on remand the district court must examine all the mitigating factors and determine whether they are sufficiently compelling that the death penalty would be unjust and impose the appropriate sentence.

## IV. CONCLUSION

We affirm Payne's conviction. For the reasons explained above, we vacate Payne's sentence and remand this matter to district court for resentencing before a different district judge.

Chief Justice EISMANN and Justices J. JONES, W. JONES and HORTON, **CONCUR.**