# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 37254

| | | |
|---|---|---|
| **ALISHA ANN MURPHY,** | ) | **2012 Unpublished Opinion No. 565** |
| | ) | |
| Petitioner-Appellant, | ) | **Filed: July 26, 2012** |
| | ) | |
| v. | ) | **Stephen W. Kenyon, Clerk** |
| | ) | |
| **STATE OF IDAHO,** | ) | **THIS IS AN UNPUBLISHED** |
| | ) | **OPINION AND SHALL NOT** |
| Respondent. | ) | **BE CITED AS AUTHORITY** |
| | ) | |

Appeal from the District Court of the Fifth Judicial District, State of Idaho, Twin Falls County. Hon. John K. Butler, District Judge.

Judgment summarily dismissing petition for post-conviction relief, <u>affirmed in part</u>, <u>reversed in part</u>, and <u>case remanded</u>.

Sara B. Thomas, State Appellate Public Defender; Erik R. Lehtinen, Chief, Appellate Unit, Boise, for appellant. Erik R. Lehtinen argued.

Hon. Lawrence G. Wasden, Attorney General; Lori A. Fleming, Deputy Attorney General, Boise, for respondent. Lori A. Fleming argued.

_____

LANSING, Judge

Alisha Ann Murphy appeals from the district court's order summarily dismissing her successive petition for post-conviction relief. She contends that the district court erred by denying her motion for appointed counsel and, alternatively, that the court erred in its determinations that her claims of ineffective assistance of trial counsel failed to establish deficient performance or prejudice.

1

# I.

# BACKGROUND

This is Murphy's fourth appeal to this Court. The factual and procedural history is set forth in the second of those appeals,[1] *Murphy v. State*, 143 Idaho 139, 139 P.3d 741 (2006), as follows:

> In the underlying criminal case, Murphy was convicted of first degree murder. The state's evidence indicated that on the night of December 18, 1995, Murphy entered the room of her children and began choking her seven-year-old son, Jimmy, with a belt. James, her husband, intervened and they began to argue. The argument continued in the kitchen, and Murphy knocked her husband unconscious with a cast-iron frying pan. Murphy then obtained a gun from a bedroom and returned to the kitchen. According to Jimmy's trial testimony, Jimmy observed his mother kneeling over his father's motionless body and placing a gun into James' hand. She appeared to be pointing the gun in the direction of his father's face. Jimmy ran back to his room and then he and his four-year-old sister, Olive, heard a loud noise. Murphy gathered the children and they walked through the kitchen where James' body was lying on the floor, exited the house and drove away.
>
> It is undisputed that Murphy and her husband were involved in a turbulent relationship marked by excessive alcohol use and physical violence. Both were extremely intoxicated on the night in question. Murphy always maintained her innocence, claiming her husband committed suicide. According to Murphy, as the fight escalated she grabbed her two children and fled the house as she had done so many times before. This version of the events was corroborated by Jimmy's initial statements to the police that he saw his father waving to them from the doorway of the house as they drove away. Murphy also insisted that after she left, her husband recorded a telephone message on the answering machine of Norma Jo Robinson, Murphy's mother, proving that he was still alive. Finally, the autopsy report prepared at the time by pathologist, Dr. Kerry Patterson, listed the manner of death as indeterminate.
>
> Several years later, Jimmy changed his story. Jimmy said that his mother had threatened to hurt him if he did not tell the police about seeing his father waving at the door. With this additional evidence, Murphy was charged with the murder of her husband. In December 1999, before the grand jury, the state's expert, Dr. Patterson, testified consistent with his autopsy report, that the manner of death was indeterminate.

---

[1]    The first appeal to this Court was the direct appeal from the judgment of conviction, *State v. Murphy*, Docket No. 27853 (Ct. App. Jan. 8, 2003) (unpublished). Murphy raised two issues-- whether there was an error in a jury instruction and whether her sentence was excessive--and this Court affirmed.

Murphy's trial counsel advised her to use a "battered woman syndrome" defense, which she rejected because she refused to admit to committing the fatal act. Murphy also rejected her counsel's recommendation to accept a reduced voluntary manslaughter charge offered by the state. Then, on the eve of the trial--in September of 2000, more than four years after James' death--Dr. Patterson, changed his opinion about the manner of death from "indeterminate" to "homicide" after examining for the first time the gun involved and the gunshot residue report. Dr. Patterson's position at trial regarding the manner of death was contrary to his autopsy report rendered three days after the death of James and contrary to his testimony before the grand jury. Defense counsel moved for a mistrial but did not request a continuance based on this change of position. At the conclusion of the trial, the jury returned a verdict of guilty. The district court imposed a life sentence with no possibility of parole. We affirmed Murphy's conviction and sentence. *State v. Murphy*, Docket No. 27853 (January 8, 2003) (unpublished).

Murphy subsequently filed a *pro se* application for post-conviction relief, raising numerous claims involving ineffective assistance of counsel, police misconduct, prosecutorial misconduct, and judicial misconduct, and incorporating a motion to amend the application upon completion of discovery. The district court appointed counsel and issued a notice of intent to dismiss Murphy's application. Post-conviction counsel responded to the court's notice by filing a memorandum and affidavits from Murphy and her trial counsel.

The court summarily dismissed all of Murphy's claims except an ineffective assistance of counsel claim relating to the testimony of Dr. Patterson and trial counsel's failure to obtain a forensic pathologist to aid the defense. The state filed a motion for summary dismissal, supported by another affidavit from Murphy's trial counsel. The court then vacated its prior summary dismissal order and directed Murphy to respond to the state's motion.

Murphy's post-conviction counsel responded by filing a motion seeking funds to retain an independent forensic pathologist to fully review the reports in the underlying criminal matter, including but not limited to James' autopsy report, the gunshot residue report, Dr. Patterson's pathology reports, and all other relevant evidence and related trial testimony. The district court denied Murphy's request for funds to retain a pathologist and granted the state's motion for summary dismissal.

*Id.* at 143-44, 139 P.3d at 745-46 (footnote omitted).

This Court affirmed in part, reversed in part, and remanded the post-conviction case to the district court for further proceedings. *Id.* at 151, 139 P.3d at 753. Of relevance to the present appeal, in Murphy's first post-conviction appeal we affirmed the summary dismissal of Murphy's claim of ineffective assistance of counsel regarding counsel's failure to call Norma Jo Robinson, Murphy's mother, to testify at trial about a telephone message allegedly left by James on Robinson's answering machine on the night that he was killed, but we reversed the summary

dismissal of her claim that defense counsel was ineffective for failing to hire a forensic pathologist to aid the defense. We remanded the case with instructions for the district court to authorize funding for a forensic pathologist to review Murphy's claim. *Id.* at 145-51, 139 P.3d at 747-53. Also of relevance to this appeal, because notice of grounds for dismissal had not been given to Murphy by the district court, we reversed the dismissal of several other claims, including claim number "12" alleging that her trial counsel was ineffective for failing to obtain telephone records that allegedly would show a call from James's cell phone or the Murphy home's landline telephone to Robinson's telephone after the time that Murphy and her children had left the house, which would support an alibi defense. *Id.* at 150-51, 139 P.3d at 752-53.

On remand, after authorizing Murphy to hire an independent forensic pathologist at public expense, the district court ultimately granted Murphy an evidentiary hearing to address her remaining claims of ineffective assistance of counsel for defense counsel's failure to (1) retain a forensic pathologist; (2) retain a gunshot residue expert; (3) retain a blood spatter expert; (4) investigate telephone records; and (5) identify an alleged "potential juror" who purportedly discussed the case with another potential juror in the hallway during juror selection. At the evidentiary hearing, counsel for Murphy, without explaining why, waived all claims except the claim relating to her trial counsel's failure to retain a forensic pathologist.[2] No evidence was presented to the district court in the form of testimony. Rather, both parties stipulated that the court could consider the reports of Dr. Patterson and Murphy's forensic pathologist, Dr. Todd Cameron Grey, as well as the grand jury and trial testimony from the underlying criminal case. Dr. Grey's initial report challenged Dr. Patterson's credentials and methodology, and the degree of certainty with which Dr. Patterson had expressed his opinion that James Murphy was the victim of a homicide. Dr. Grey's first report took issue with Dr. Patterson's opinion testimony that James did not shoot himself because a lab report stated that gunshot residue was found on the palms of both of James's hands but not on the back of either hand. Citing this testimony, in his first report Dr. Grey stated:

> Dr. Patterson's claim that the GSR results prove this was a homicide is nonsense. Even if one accepts the validity of the sampling and testing, the results only indicate the decedent's hands were exposed to gun smoke. Any number of interpretations of the meaning of that finding can be legitimately offered.

---

[2] Despite the waiver, the district court, in order to establish a complete record, addressed and denied each of the other claims in a memorandum decision.

Dr. Patterson produced a rebuttal report addressing Dr. Grey's concerns and maintaining his opinion that James Murphy had not committed suicide. Dr. Patterson's rebuttal report stated:

> In this case, the GSR was found only on the right and left palms of the decedent. This is not a pattern typically seen in suicides caused by self-inflicted gunshot wounds to the head. In suicides, GSR is typically found on the back of the hand holding the weapon and, in many cases, on the trigger finger. . . . The GSR pattern in this case is more consistent with the hand of the decedent being held or cupped around the grips of the gun by the assailant when the weapon was fired.

Dr. Grey then produced a second report in which he stated:

> I agree that if one accepts that the sampling, evidence handling and testing for GSR was performed appropriately and according to standards, if residue was present only on the right and left palms, it would be atypical for suicide and that the more likely pattern is residue on the back of at least one hand.

The district court denied relief on Murphy's claim that she had received ineffective assistance of counsel because her defense attorney had not hired a forensic pathologist. The district court found Dr. Grey's concession that the lack of GSR on the back of James's hands was "atypical" of suicide to be very significant because if the gun had been discharged by James one would expect to find GSR on the back of at least one hand. Therefore, the district court found that Murphy had not shown that she was prejudiced by her attorney's omission to retain a forensic pathologist to aid in her defense. Murphy appealed again to this Court.

This Court affirmed. *Murphy v. State*, Docket No. 34920 (Ct. App. April 17, 2009) (unpublished). Like the district court, we discerned no prejudice to Murphy from defense counsel's failure to hire a forensic pathologist. In our discussion of the lack of prejudice, we outlined the trial evidence of Murphy's guilt:

> Jimmy and Olive Murphy both testified at Alisha Murphy's trial and implicated her in the death of her husband, James Murphy. Both testified that on the night of their father's death, Murphy entered their bedroom and began to strangle Jimmy with a belt. Olive testified that Murphy threatened Olive with the same treatment unless she turned over. James Murphy entered the room and James and Alisha began fighting. The fighting eventually moved to the kitchen. Jimmy testified that he went downstairs to check on the Christmas tree at Olive's request. After he went back upstairs, the sounds of fighting stopped. Jimmy testified that Murphy came upstairs and walked in the direction of the bathroom and her bedroom. She walked back downstairs, and shortly thereafter Jimmy went downstairs to find her in the kitchen. He testified that he saw Murphy

5

kneeling down next to his father, who was lying on the kitchen floor. Jimmy testified that he saw Murphy place a gun in James Murphy's hand and point it toward his face. Jimmy ran back to his room when he heard a loud noise. Olive testified that she heard a gunshot. Both children testified that Murphy told them that they were leaving. They also testified that they stepped over the body of James Murphy on their way to the vehicle. Olive testified that she saw Murphy place a gun in James Murphy's hand. Both children also testified that when they left, James Murphy was not moving or talking. Jimmy testified that the reason that he gave another account of the events of that evening was because his mother had threatened to "shoot [him] and stab [him] and cut [his] heart out if [he] did tell."

Both Jimmy and Olive testified that they first left the house in their father's truck, which Murphy drove into the ditch. Police officers corroborated this testimony at trial. They got out of the truck and left in their car. Murphy was eventually arrested that night for DUI. She told officers not to go to the house because James Murphy had guns and was not afraid to use them. Some officers did check the house that night but no one answered when they knocked on the doors and windows. She also told several officers and repeated several times that she had "beat [James] pretty good" and that she "wasn't going to get beat no more." One officer testified that Murphy told him that she had "beaten the crap out of [James] with a frying pan." Another officer testified that she observed Murphy "waiving her hands in the air" and putting her hands out in a position "[k]ind of like a gun, holding a gun."

After Murphy was released from jail the next day, she requested that the police escort her to her home to pick up her belongings. An officer testified that when he arrived he requested that she give him the key to the house so that he could neutralize the situation, but Murphy walked up to the door and unlocked it herself. The officer testified that he held the door open about 8 to 10 inches, crouched down, and called out to James. Murphy then said, "Oh, my God, there he is," and pushed the door open. However, the officer testified that the house was dark and that he could not see James until he was approximately three feet from his body. Other officers arriving at the scene also testified that they could not see James until approximately three feet from the body. Murphy subsequently asked the officer whether he thought James had killed himself. When the officer responded that he did not know, she asked whether it was a homicide and whether she was a suspect. She asked several officers whether she was a suspect.

When Murphy was subsequently interviewed, she indicated that James had shot himself with a .22 caliber revolver before police had informed her of the cause of death. She also wanted to know whether Jimmy had stated that James was lying on the floor when they left. She inquired as to whether the police found any gunpowder on James' hands. While she was being interviewed and before any officers had said anything about their theory of the case, she indicated to the police, "in my mind I believe that you think that I hit him with the flipping frying pan and went back and shot him."

There was also testimony elicited from a social worker assigned to work with Murphy's family. She indicated that she had noticed that Jimmy and Olive

6

had difficulty around Christmas time every year. During one of the yearly update meetings with Murphy, Murphy "demanded to know what the children were saying happened on the night of December 18th, 1995." At a later meeting, the social worker stated that she knew what had happened on December 18, 1995, to which Murphy responded, "I didn't mean to do it. I thought he was already dead."

While that appeal was pending, Murphy filed the present successive petition for post-conviction relief. She asserted two new claims of ineffective assistance of defense counsel: (1) failure to object to the testimony of Jimmy's treating psychiatrist, Dr. Richard Worst, who diagnosed Jimmy as suffering from post-traumatic stress disorder; and (2) failure to object to the testimony of a social worker who recounted that Murphy said to her, "I didn't mean to do it. I thought he was already dead." Murphy also asserted two claims of ineffective assistance of trial counsel that were made in her first post-conviction action but abandoned by her post-conviction counsel: failure to retain a "gunshot residue expert" and failure to investigate telephone records, which Murphy contends will provide her an "alibi" defense because they will show a call placed by James on his cell phone or from the Murphy landline home telephone to Murphy's mother after Murphy had already left the house with her two children. Murphy also filed a motion for appointment of counsel.

The district court issued a notice of intent to dismiss the successive petition, while reserving ruling on the motion for appointment of counsel pending Murphy's response. When Murphy's response was not received within a month, the district court denied the motion for counsel and dismissed the petition. Upon receiving Murphy's belated response (which Murphy apparently had sent only to the prosecutor's office), the court treated it as a timely motion for relief from the judgment under I.R.C.P. 60(b), but again dismissed the petition. Murphy appeals.

## II.

## ANALYSIS

Murphy asserts error in the denial of her motion for appointment of counsel and, alternatively, the summary dismissal of her claims for relief.

Idaho Code Sections 19-4906(b) and (c) authorize summary dismissal of a petition for post-conviction relief, either pursuant to motion of a party or upon the court's own initiative, if "it appears from the pleadings, depositions, answers to interrogatories, and admissions and agreements of fact, together with any affidavits submitted, that there is no genuine issue of

7

material fact and the moving party is entitled to judgment as a matter of law." I.C. § 19-4906(c). Like plaintiffs in other civil actions, the petitioner must prove by a preponderance of evidence the allegations upon which the request for post-conviction relief is based. I.C. § 19-4907; *Stuart v. State*, 118 Idaho 865, 869, 801 P.2d 1216, 1220 (1990); *Goodwin v. State*, 138 Idaho 269, 271, 61 P.3d 626, 628 (Ct. App. 2002). Therefore, any claim asserted in the petition will be subject to summary dismissal if the petitioner fails to present evidence making a prima facie case as to each essential element of that claim. *DeRushé v. State*, 146 Idaho 599, 603, 200 P.3d 1148, 1152 (2009); *Berg v. State*, 131 Idaho 517, 518, 960 P.2d 738, 739 (1998). When considering summary dismissal, the district court must construe disputed facts in the petitioner's favor, but the court is not required to accept either the petitioner's mere conclusory allegations, unsupported by admissible evidence, or the petitioner's conclusions of law. *State v. Payne*, 146 Idaho 548, 561, 199 P.3d 123, 136 (2008); *Roman v. State*, 125 Idaho 644, 647, 873 P.2d 898, 901 (Ct. App. 1994).

Claims may be summarily dismissed if the petitioner's allegations are clearly disproven by the record of prior proceedings or do not justify relief as a matter of law. *Kelly v. State*, 149 Idaho 517, 521, 236 P.3d 1277, 1281 (2010); *McKay v. State*, 148 Idaho 567, 570, 225 P.3d 700, 703 (2010); *Charboneau v. State*, 144 Idaho 900, 903, 174 P.3d 870, 873 (2007); *Murphy*, 143 Idaho at 145, 139 P.3d at 747; *Cootz v. State*, 129 Idaho 360, 368, 924 P.2d 622, 630 (Ct. App. 1996). Thus, summary dismissal of a petition for post-conviction relief is appropriate when the court can conclude, as a matter of law, that the petitioner is not entitled to relief even with all disputed facts construed in the petitioner's favor. For this reason, summary dismissal of a post-conviction petition may be appropriate even when the State does not controvert the petitioner's evidence. *See Payne*, 146 Idaho at 561, 199 P.3d at 136; *Roman*, 125 Idaho at 647, 873 P.2d at 901.

Conversely, if the petition, affidavits, and other evidence supporting the petition allege facts that, if true, would entitle the petitioner to relief, the post-conviction claim may not be summarily dismissed. *Charboneau v. State*, 140 Idaho 789, 792, 102 P.3d 1108, 1111 (2004); *Berg*, 131 Idaho at 519, 960 P.2d at 740; *Stuart*, 118 Idaho at 934, 801 P.2d at 1285; *Sheahan v. State*, 146 Idaho 101, 104, 190 P.3d 920, 923 (Ct. App. 2008); *Roman*, 125 Idaho at 647, 873 P.2d at 901. If a genuine issue of material fact is presented, an evidentiary hearing must be

conducted to resolve the factual issues. *Payne*, 146 Idaho at 561, 199 P.3d at 136; *Goodwin*, 138 Idaho at 272, 61 P.3d at 629. *See also Kelly*, 149 Idaho at 521, 236 P.3d at 1281.

On appeal from an order of summary dismissal, we examine whether the petitioner's admissible evidence asserts facts which, if true, would entitle the petitioner to relief. *Berg*, 131 Idaho at 519, 960 P.2d at 740; *Sheahan*, 146 Idaho at 104, 190 P.3d at 923; *Roman*, 125 Idaho at 647, 873 P.2d at 901. Over questions of law, we exercise free review. *Rhoades v. State*, 148 Idaho 247, 250, 220 P.3d 1066, 1069 (2009); *Downing v. State*, 136 Idaho 367, 370, 33 P.3d 841, 844 (Ct. App. 2001); *Martinez v. State*, 130 Idaho 530, 532, 944 P.2d 127, 129 (Ct. App. 1997).

After an initial post-conviction petition has been pursued, a convicted person may file a successive petition only if "the court finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the original, supplemental, or amended application." I.C. § 19-4908. *See also Charboneau*, 144 Idaho at 904, 174 P.3d at 874; *Schwartz v. State*, 145 Idaho 186, 189, 177 P.3d 400, 403 (Ct. App. 2008). A deficiency in the prior post-conviction counsel's representation of the petitioner may provide sufficient reason for permitting newly asserted allegations, or allegations inadequately raised or supported in the initial post-conviction action, to be raised in a successive post-conviction petition. *See Palmer v. Dermitt*, 102 Idaho 591, 596, 635 P.2d 955, 960 (1981); *Hernandez v. State*, 133 Idaho 794, 798, 992 P.2d 789, 793 (Ct. App. 1999).

Murphy argues that she received ineffective assistance of prior post-conviction counsel for failure to find and assert her two new claims and for abandoning her two reasserted claims as her "sufficient reason" for pursuing this successive petition. With regard to the two new claims, the parties are in dispute over whether, and to what extent, appointed post-conviction counsel is obligated to search the record to independently identify and assert claims for relief that were not first expressly asserted by a pro se petitioner. In addition, the State, for the first time on appeal, asserts that post-conviction counsel's abandonment of the two previously asserted claims was a legitimate "strategy."

With respect to three of Murphy's four claims, we need not resolve these issues because we conclude that Murphy has not shown that these present even a "possibility of a valid claim," and therefore the district court did not err in declining to appoint counsel to pursue them or in dismissing the claims. A request for counsel is properly denied where a petitioner does not allege facts raising even the possibility of a valid claim. *Workman v. State*, 144 Idaho 518, 529,

9

164 P.3d 798, 809 (2007); *Swader v. State*, 143 Idaho 651, 653-55, 152 P.3d 12, 14-16 (2007); *Plant v. State*, 143 Idaho 758, 760-63, 152 P.3d 629, 631-34 (Ct. App. 2006); *Newman v. State*, 140 Idaho 491, 493-94, 95 P.3d 642, 644-45 (Ct. App. 2004). As explained in *Judd v. State*, 148 Idaho 22, 218 P.3d 1 (Ct. App. 2009):

> If a post-conviction petitioner is unable to pay for legal representation, the trial court may appoint counsel at public expense. I.C. § 19-4904. While the decision to grant or deny a request for court-appointed counsel is discretionary, *Charboneau v. State*, 140 Idaho 789, 792, 102 P.3d 1108, 1111 (2004), counsel should be appointed if the petitioner qualifies financially and "alleges facts to raise the possibility of a valid claim." *Id.* at 793, 102 P.3d at 1112; *Plant v. State*, 143 Idaho 758, 761, 152 P.3d 629, 632 (Ct. App. 2006). In adopting this standard, the *Charboneau* Court reasoned that because a pro se petitioner may not know the essential elements of a claim, potentially meritorious petitions may be conclusory and incomplete. *Charboneau*, 140 Idaho at 792-93, 102 P.3d at 1111-12. Consequently, if facts are alleged giving rise to the *possibility* of a valid claim, the trial court should appoint counsel in order to give the petitioner an opportunity to work with counsel and properly allege the necessary supporting facts. *Id.* "[E]very inference must run in the petitioner's favor where the petitioner is unrepresented at that time and cannot be expected to know how to properly allege the necessary facts." *Id.* at 794, 102 P.3d at 1113. Only if all of the claims alleged in the petition are frivolous may the court deny a request for counsel. *Id.* at 792, 102 P.3d at 1111; *Brown v. State*, 135 Idaho 676, 679, 23 P.3d 138, 141 (2001). If the court decides that the claims in the petition are frivolous, it should provide sufficient notice regarding the basis for its ruling to enable the petitioner to provide additional facts, if they exist, to demonstrate the existence of a non-frivolous claim. *Swader v. State*, 143 Idaho 651, 653-54, 152 P.3d 12, 15-16 (2007); *Charboneau*, 140 Idaho at 793, 102 P.3d at 1112.
>
> The determination whether to appoint counsel and the determination whether a petition is subject to summary dismissal are thus controlled by quite different standards, with the threshold showing that is necessary in order to gain appointment of counsel being considerably lower than that which is necessary to avoid summary dismissal of a petition. [*Swader*,] at 655, 152 P.3d at 16; *Plant*, 143 Idaho at 761, 152 P.3d at 632.

*Judd*, 148 Idaho at 24, 218 P.3d at 3. Three of Murphy's claims for relief do not meet this standard for appointment of counsel and, hence, also do not meet the higher standard necessary to avoid summary dismissal.

A.      **Claims that Were Properly Dismissed**

1.      **Dr. Worst's trial testimony**

At trial, psychiatrist Dr. Richard Worst testified that he diagnosed Murphy's son Jimmy as suffering from Post-traumatic Stress Disorder, which can be caused by a "really terrifying

10

psychological event." Murphy contends that because Worst did not tie this disorder to a particular event, Worst's testimony was irrelevant and unfairly prejudicial, and defense counsel was ineffective for failing to object on these grounds.

In order to prevail on a claim of ineffective assistance of counsel, a post-conviction petitioner must demonstrate both that her attorney's performance was deficient, and that she was thereby prejudiced in the defense of the criminal charge. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Murphy*, 143 Idaho at 145, 139 P.3d at 747. To show deficient performance, a petitioner must overcome the strong presumption that counsel's performance was adequate by demonstrating "that counsel's representation did not meet objective standards of competence." *Roman*, 125 Idaho at 648-49, 873 P.2d at 902-03. *See also Vick v. State*, 131 Idaho 121, 124, 952 P.2d 1257, 1260 (Ct. App. 1998). If a petitioner succeeds in establishing that counsel's performance was deficient, she must also prove the prejudice element by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The benchmark for judging a claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Id.* at 686.

We conclude that with respect to this issue, Murphy has failed to raise the possibility of a valid claim warranting appointment of counsel because no prejudice exists. In view of the compelling evidence of Murphy's guilt summarized above, Murphy has not shown even the reasonable possibility of a different outcome at trial had Dr. Worst's testimony been totally excluded on an objection by defense counsel. Therefore, the district court did not err in failing to appoint counsel to assist Murphy in pursuing this legally frivolous claim or in dismissing the claim.

### 2. The social worker's testimony

At trial, there was testimony elicited from a social worker assigned to work with Murphy's family. She indicated that she had noticed that Jimmy and Olive had emotional difficulty around Christmastime every year. During one of the social worker's yearly update meetings with Murphy, Murphy "demanded to know what the children were saying happened on the night of December 18th, 1995." At a later meeting, the social worker told Murphy that she

11

knew what had happened on December 18, 1995, to which Murphy responded, "I didn't mean to do it. I thought he was already dead." Murphy asserts that trial counsel was ineffective for failing to object that her statement to the social worker was privileged from disclosure under Idaho Rule of Evidence 518.

The district court held that these allegations did not raise the possibility of a valid claim because, even assuming Murphy was a "client" entitled to invoke the privilege, Murphy's statement was subject to the privilege exception set forth in I.R.E. 518(d)(1), which provides:

> **(d) Exceptions.** There is no privilege under this rule:
> (1) Contemplation or Execution of Crime or Harmful Act. If the communication reveals the contemplation or execution of a crime or harmful act.[3]

Murphy argues that the exception should be "narrowly construed" and advances a tortured interpretation to the effect that only "direct statements" of a crime or harmful act should be subject to the exception, and not the inferential admission made by Murphy here. We disagree. When interpreting a rule of evidence, Idaho appellate courts apply the same standards of construction as are utilized with statutes. *Miller v. Haller*, 129 Idaho 345, 350, 924 P.2d 607, 612 (1996). "We begin with an examination of the literal words of the rule and give the language its plain, obvious and rational meaning." *Id.*; *State v. Trejo*, 132 Idaho 872, 878, 979 P.2d 1230, 1236 (Ct. App. 1999).

Applying the plain meaning of the language at issue, Murphy's statement, viewed in context, *reveals* the execution of a crime or harmful act. Therefore, the possibility of a valid claim is not presented here because, even assuming all of the other prerequisites of the privilege

---

[3] The I.R.E. 518(d)(1) exception is consistent with a corresponding Idaho statutory exception to privilege under the Social Work Licensing Act, I.C. § 54-3213(2), which states:

> No person licensed under the provisions of this chapter shall disclose any information he may have acquired from persons consulting him in his professional capacity that was necessary to enable him to render services in his professional capacity to those persons, except:
>
> . . . .
> (2) That a person licensed under the provisions of this chapter shall not be required to treat as confidential communication that *reveals the contemplation or execution of a crime or harmful act*.

rule were satisfied, Murphy's statement was not privileged, and her trial counsel could not have been ineffective for failing to object on this basis.

### 3. Failure to retain a "gunshot residue expert"

Murphy next contends that her trial counsel was ineffective for failure to retain a gunshot residue ("GSR") expert at trial. This was a claim that she asserted in her original petition but, after remand from this Court in *Murphy*, 143 Idaho at 143-44, 139 P.3d at 745-46, her post-conviction counsel abandoned the claim. Murphy's prior post-conviction attorney had hired a forensic scientist, Pamela Marcum, who wrote a report critical of the GSR interpretations advanced at trial by the State's forensic pathologist, Dr. Patterson. Murphy attached Dr. Marcum's report to her successive petition, and she asserts that her prior post-conviction counsel incompetently failed to pursue her claim that defense counsel was ineffective for failure to retain a "gunshot residue expert" in light of Marcum's report.

Murphy's position on appeal is premised on the erroneous assumption that she has not, to date, enjoyed the services of an expert qualified to interpret GSR evidence. Murphy asserts that in the previous post-conviction case her forensic pathologist, Dr. Grey, "expressed concerns about Dr. Patterson's interpretation of the GSR report, but made it clear that he was not qualified to render an opinion on that topic," citing to both of Dr. Grey's reports submitted in the prior post-conviction case. This assertion is simply not true. Nowhere in Dr. Grey's reports does he indicate that he is not qualified to interpret GSR evidence. To the contrary, his reports *include* his interpretations of the GSR evidence obtained in this case. Specifically, in his first report Dr. Grey stated:

> Dr. Patterson's claim that the GSR results prove this was a homicide is nonsense. Even if one accepts the validity of the sampling and testing, the results only indicate the decedent's hands were exposed to gun smoke. Any number of interpretations of the meaning of that finding can be legitimately offered.

In Dr. Grey's second report, he stated:

> I agree [with Dr. Patterson] that if one accepts that the sampling, evidence handling and testing for GSR was performed appropriately and according to standards, if residue was present only on the right and left palms, it would be atypical for suicide and that the more likely pattern is residue on the back of at least one hand.

13

Thus, Dr. Grey clearly provided expert testimony on the interpretation of the results contained in the gunshot residue report. In addition, Dr. Marcum also opined on Dr. Patterson's conclusions, and her criticisms of Dr. Patterson's interpretation of the GSR results were not materially different than those of Dr. Grey.

Because Murphy's claim that her post-conviction lawyer did not retain an expert in gunshot residue interpretation is disproven by the record, the district court did not err in holding that Murphy's successive petition failed to raise the possibility of a valid claim regarding a gunshot residue expert. The same claim was raised and adequately supported in the prior post-conviction case, and her current effort to revisit the issue in a successive petition is barred by res judicata. *See State v. Beam*, 115 Idaho 208, 210-11, 766 P.2d 678, 680-81 (1988); *State v. Dempsey*, 146 Idaho 327, 330, 193 P.3d 874, 877 (Ct. App. 2008); *Knutsen v. State*, 144 Idaho 433, 439, 163 P.3d 222, 228 (Ct. App. 2007); *State v. LePage*, 138 Idaho 803, 811, 69 P.3d 1064, 1072 (Ct. App. 2003).[4]

**B.     Telephone Records**

In her prior petition, Murphy asserted a claim of ineffective assistance of trial counsel for failure to obtain telephone records for James's cell phone, the Murphy landline telephone, or the landline telephone of Murphy's mother. Murphy alleged these records would show a call from James to her mother's telephone after Murphy had left the house with the children, thus providing her with an alibi and supporting her theory of suicide. On remand from *Murphy*, 143 Idaho 139, 139 P.3d 741, this claim remained viable, but Murphy's post-conviction attorney abandoned it without explanation in the record as to why he did so. Murphy reasserts the claim in this successive action. She asserts that she has for "ten years" been asking her defense attorney and two prior post-conviction attorneys to "subpoena" these records, but they have failed to do so.

In *Murphy*, we affirmed the district court's dismissal of a related post-conviction claim-- that trial counsel was ineffective for failing to call Murphy's mother as a witness to testify about

---

[4]     This disposition resolves Murphy's additional appellate claim that the Idaho Supreme Court is denying her due process by failing to authorize the preparation of an additional transcript at State expense.

the message from James on her answering machine and the time it was received.[5] Our opinion recited the reasons given by Murphy's defense attorney for not using the mother as a witness:

> Mr. Robinson, Mr. Gold and I explored the possibility of calling Ms. Murphy's mother, Norma Jo Robinson, and her mentally-challenged sister, Elaina Grammar, as witnesses in this matter. After conferring on this matter, we decided that doing so would hurt the defense case. We determined, before the trial, that Ms. Grammar was not a reliable witness. She changed her recitation of the facts frequently. We determined that Ms. Robinson was neither reliable nor a [sic] helpful to the defendant's case and that her demeanor would have harmed the defendant at trial. This determination was somewhat borne out when, during the trial, she was charged with (and later convicted of) felony witness intimidation for threatening the child witnesses in the hall of the courthouse.
>
> We did look in to [sic] how and where to obtain the victim's cell phone records, but ultimately did not get them. I believe that had we obtained and presented those records, regardless of what they might have shown, they would have been of little to no evidentiary value, in part because they could establish only that a call had been placed, not that the victim was the person who placed the call.
>
> The district court determined that counsel's decision not to put Robinson on the witness stand was a matter of reasonable strategy or trial tactics. We agree. On the record before us, the claim that trial counsel unreasonably failed to call Robinson as a witness was properly dismissed on the basis that counsel's decision was one of legitimate trial strategy.

*Id.* at 149-50, 139 P.3d at 751-52.

In the present case, the district court held that Murphy's current claim that defense counsel was deficient for failing to obtain telephone records was not potentially valid because the same claim had been adjudicated by the foregoing discussion in *Murphy*. However, a close reading of the opinion shows that this is incorrect, for the issue decided was whether trial counsel was ineffective in failing to present Murphy's mother's testimony, not for failure to present the telephone records themselves. Further, in the conclusion section of *Murphy*, 143 Idaho at 151, 139 P.3d at 753, this Court remanded a number of claims due to the district court's failure to provide any notice or reason for summarily dismissing them, including claim "12," asserting ineffective assistance of defense counsel for failure to obtain the telephone records.

The district court here also reasoned that the testimony of Murphy's mother's would have been needed to present the telephone records and that the decision of Murphy's defense counsel

---

[5] The voice on the answering machine audio tape said, "Forgive me. I don't have nothin' to say to nobody. Pick up the kids tomorrow . . . ."

15

to not call the mother had already been held to be a legitimate strategy not subject to collateral attack. In this appeal, Murphy asserts that this reasoning was flawed, and we agree. A foundation for introduction of telephone records could have been laid through the testimony of a telephone company employee rather than through Murphy's mother.

The question thus becomes whether Murphy has presented the possibility of a valid claim here warranting appointment of counsel. As stated by our Supreme Court:

> When considering a motion for appointment of counsel, the trial court must do more than determine whether the petition alleges a valid claim. The court must also consider whether circumstances prevent the petitioner from making a more thorough investigation into the facts. An indigent defendant who is incarcerated in the penitentiary would almost certainly be unable to conduct an investigation into facts not already contained in the court record. Likewise, a *pro se* petitioner may be unable to present sufficient facts showing that his or her counsel's performance was deficient or that such deficiency prejudiced the defense. That showing will often require the assistance of someone trained in the law. Therefore, the trial court should appoint counsel if the petition alleges facts showing the possibility of a valid claim such that a reasonable person with adequate means would be willing to retain counsel to conduct a further investigation into the claim. The investigation by counsel may not produce evidence sufficient to survive a motion to dismiss. But, the decision to appoint counsel and the decision on the merits of the petition if counsel is appointed are controlled by two different standards.

*Swader v. State*, 143 Idaho 651, 654-55, 152 P.3d 12, 15-16 (2007). Our Supreme Court has also said that "in determining whether [a petitioner has] raised the possibility of a valid claim, we consider whether the appointment of counsel would have assisted him in conducting an investigation into facts not in the record and whether a reasonable person with adequate means would have been willing to retain counsel to conduct that further investigation into the claim." *Melton v. State*, 148 Idaho 339, 342, 223 P.3d 281, 284 (2009).

This allegation of ineffective assistance presents at least the possibility of a valid claim warranting appointment of counsel. Evidence in Murphy's murder trial established that after leaving the house on the night in question, she was arrested for DUI at about 10:15 p.m. and was not released from jail until the next morning. If a call was placed from James's cell phone or from the Murphy home's landline telephone to Murphy's mother or to anyone else *after* Murphy was stopped by police around 10:15 p.m. and before she was released from jail the next day, this would be significant evidence that James was still alive when Murphy left the home; Murphy would not also need to prove that the recorded message on Murphy's mother's answering

16

machine was *that call*. If the records show a call to someone other than Murphy's mother, that individual might be able to provide testimony helpful to the defense.

It is possible, of course, that one of Murphy's prior post-conviction attorneys did obtain the telephone records but abandoned the claim, without informing the district court, because the records did not show any calls during Murphy's period in custody. That, however, is a question that may be addressed on remand. We remand this claim to the district court for appointment of counsel to obtain the relevant telephone records and resolve this issue once and for all.

## III.

## CONCLUSION

We reverse the district court's denial of counsel and summary dismissal of the telephone records claim. In all other respects the district court's orders are affirmed.

Judge GUTIERREZ and Judge MELANSON **CONCUR.**